**NATIONAL JUVENILE LAW CENTER, INC., et al., Plaintiffs,**

v.

**Alfred S. REGNERY, et al., Defendants.**

**Civ. A. No. 83–1103.**

United States District Court, District of Columbia.

May 26, 1983.

David J. Cynamon, Laird Hart, Michael T. Buckley, Covington & Burling, Washington, D.C., for plaintiffs; Karr & Lyons, Washington, D.C., of counsel.

Betsy Gray, U.S. Dept. of Justice, John Wilson, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This matter is before the Court on the merits of plaintiffs' complaint. Plaintiff National Juvenile Law Center, Inc. (the Law Center) is a private, non-profit organization which, among other things, engages in litigation on behalf of juveniles in accordance with the purposes of the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. §§ 5601, *et seq.* (the Juvenile Justice Act). The individual plaintiffs are two juveniles who are also plaintiffs in civil suits being litigated on their behalf by the Law Center. These suits challenge certain official practices in Puerto Rico and Tennessee concerning the pretrial detention of juveniles. Defendants are the Office of Juvenile Justice and Delinquency Prevention (OJJDP), an agency of the Department of Justice established by the Juvenile Justice Act, and Alfred S. Regnery, who was the agency's acting administrator at the time this action was filed and since has been confirmed as its permanent administrator.

The Law Center has since 1978 received grant monies from OJJDP under the Juvenile Justice Act in order to engage in its litigation and other advocacy efforts for the juveniles. Aware that funding would not continue in perpetuity, the Law Center has endeavored to reduce its litigation docket and now is involved in only ten pending cases. Some of these cases, however, may require two years for completion. Yet since March 31, 1983 defendants have provided the Law Center with no funding. Moreover, the Law Center now faces insolvency and, according to counsel, its board of directors plan to meet on May 27, 1983 to vote on whether to file for bankruptcy. As a result, plaintiffs argue, the persons represented by the Law Center—as well as the Law Center itself—will be irreparably harmed unless it receives additional monies. The Law Center contends that OJJDP is obligated to furnish just enough funding to

allow it to complete the existing litigation. Defendants, on the other hand, characterize this case as an action by a disappointed grant applicant to overturn the agency's denial of its funding request, and assert that this is a matter for which administrative remedies must first be exhausted before judicial intervention is proper and that such review lies exclusively in the Court of Appeals.

Plaintiffs' application for a temporary restraining order compelling defendants to provide them with interim funding, filed April 15, 1983, was denied by this Court three days later generally because the type of harm alleged did not justify such extraordinary relief. Indeed, plaintiffs concede that no irreparable harm has inured to the plaintiff juveniles over the past month for the reason that their lawsuits have not progressed at such a pace at which they could have been harmed by any disruption to the Law Center's activities. Yet at this point, plaintiffs argue, the disruption and delay that would ensue to the Law Center and its clients over an open-ended period of time absent injunctive relief would be irreparable. The Court agrees, and for the reasons which follow grants the relief sought by plaintiffs.

The facts generally are not disputed. On November 5, 1980, the Law Center received a two-year grant of $997,071 in accordance with the Juvenile Justice Act. This followed a similar two-year grant awarded to it in 1978. Section 228(a) of Title II of that act, 42 U.S.C. § 5638(a) (1976) provided that

In accordance with criteria established by the Administrator [of the Law Enforcement Assistance Administration], it is the policy of Congress that programs funded under this subchapter shall continue to receive financial assistance providing that the yearly evaluation of such programs is satisfactory.

Yet the May 14, 1980 announcement in the Federal Register for the Capacity Buildings Program, under which the Law Center competed for and was awarded a grant, stated that OJJDP "ma[de] no commitment to continuation funding of individual projects under the program beyond the two year project period." 45 Fed.Reg. 31888, 31890 (1980). Furthermore, the grant award document presented to the Law Center contained various special conditions in the same vein. Special Condition No. 10 noted that

This award in no way commits LEAA to future funding of the project. Any such future consideration will depend upon the achievements of the initial funding period and the availability of funds.

Special Condition No. 12 announced that OJJDP was in the process of developing a continuation funding policy which might affect a grantee's choice of litigation. It read:

OJJDP is developing a continuation funding policy which may affect your choice of litigation. The funding policy may place limits on length of Federal support and should be taken into consideration in decisions to initiate long-term litigation.

The agency was well aware of the nature of the Law Center's litigation activities, which were in accordance with the objectives of the Juvenile Justice Act. The Law Center's proposal for its previous grant (approved in 1978 for two years) noted that it would engage in litigation to "challenge inappropriate institutional practices" concerning juveniles. Appendix A to Complaint at 1, 3. Likewise, its proposal for its 1980 grant explained the features of its litigation program, noting that it "focuses on class action litigation," that its litigation docket was "quite extensive," and describing the specific issues and relief requested in several examples of its lawsuits. Appendix D to Complaint at 2–3, 5–7. OJJDP authorized the Law Center to use its 1980 grant funds not only to continue and complete its existing litigation but to initiate lawsuits as well.

OJJDP exercised a certain amount of control over the Law Center's activities. For example, it directed the Law Center not to use grant funds to prosecute damage actions because such suits served the interests of individual injured plaintiffs rather than advanced the Juvenile Justice Act's

objectives of improving matters for juveniles on a more general basis. The agency also determined in which "target" states the Law Center could carry out its litigation work and caused it to cease activities in Oklahoma when that state was removed from the list of "maintenance of effort" states—states in which the Law Center was specifically authorized to continue its work.

After the Law Center received its 1980 grant, Congress repealed section 228(a). Legislative history shows that the section was repealed for budgetary reasons: Congress did not want the Juvenile Justice Act to establish an entitlement program. 126 Cong.Rec.H. 10931 (daily ed. Nov. 19, 1980) (remarks of Rep. Coleman). Congress was prompted to repeal this section because of the decision of an administrative law judge in *In Re READ, Inc.*, No. 9–1241–O–MD–JJ (Law Enforcement Assistance Admin., Mar. 3, 1980) rejecting OJJDP's argument that it could set its own standards for terminating programs despite section 228(a)'s statement that programs should continue to receive funding as long as their annual evaluations were satisfactory. 126 Cong.Rec.H. 10931. The program in *In Re READ, Inc.* involved a project to improve literacy; Congress felt that such a project should not be an entitlement program.

Following the repeal of section 228(a), on January 22, 1981 OJJDP promulgated the continuation policy which it noted was forthcoming in Special Condition No. 12 of the grant. It remarked that the repeal "does not preclude OJJDP's adoption of a continuation policy" and stated the agency's view that the repeal did not remove its ability to promulgate "a policy permitting long-term funding" under OJJDP criteria. 46 Fed.Reg. 7109, 7110 (1981). It stated that it was the agency's policy that projects funded through grants awarded under the Juvenile Justice Act "will be eligible for continuation funding beyond their initial project period" based on the general continuation criteria set forth elsewhere in the policy statement—criteria which there is no dispute that the Law Center satisfied. *Id.* at 7111. It also noted that eligible applicants meeting these criteria "will be considered for refunding provided that they

have received a satisfactory evaluation as determined under the satisfactory evaluation principles stated herein and in accordance with specific performance measures indicated in an applicable program announcement or the terms and conditions of the grant award." *Id.* Finally, it promised that "[p]rojects that are continued will be funded at a level necessary to sustain essential project activities whether below, at, or above prior funding levels as OJJDP determines to be appropriate and necessary to successful continuation." *Id.* Inasmuch as this new continuation policy advised grantees that continuation fundings would be available to those receiving satisfactory performance evaluations, the Law Center interprets this policy as effectively repeating the assurances of section 228(a) despite its repeal.

Ira M. Schwartz, the Administrator of OJJDP at the time of the award of the Law Center's 1980 grant and whose signature appears on the January 22, 1981 policy statement printed in the Federal Register, submitted an affidavit in which he stated that he "believed that the OJJDP had an obligation and responsibility to provide funding support for [the Law Center's litigation] efforts on an ongoing basis." Schwartz Affidavit, Appendix I to Plaintiffs' Supplementary Memorandum, at 8. Because he "was concerned about what would happen to these lawsuits [brought by groups such as the Law Center] and the clients they represented in the event that these agencies were unable to secure OJJDP funds on a competitive basis," Schwartz stated, "[he] felt that these grantees warranted special consideration and that the Office had an obligation and responsibility under the Act to provide ongoing support for these programs." *Id.* at 9–10. He stated that he asked for a legal opinion from the General Counsel of the Office of Justice Assistance, Research and Statistics, on the question of the agency's obligation to provide continued support for litigation in progress. *Id.* at 10. The General Counsel's opinion, he stated, "suggested that the Office had no legal, ethical or moral responsibility to provide continued

funding for litigation in progress. On the other hand, I was informed that I could develop such a policy if appropriate from a programmatic perspective." *Id.* Schwartz was not entirely in agreement with the conclusion of the opinion regarding OJJDP's obligation to provide future funding, and informed various grantees, including the Law Center, accordingly. *Id.* at 11. He stated that he advised those grantees that he planned to move toward developing a litigation policy, but that policy never was developed because of the change in the presidential administration. *Id.* Regarding section 228(a), Schwartz stated that "[t]he need to develop a litigation policy and provide on-going support for litigation activities was viewed by me as something quite different and distinct from the implications of" that section. *Id.* at 12.

OJJDP retracted its January 1981 policy some five months later on June 26, 1981 and issued a new continuation policy in anticipation that the Administration's budget proposal for Fiscal Year 1982 would be adopted and that therefore OJJDP would be left without funds. (In fact, that budget proposal was not adopted and OJJDP did not lose its funding.) This policy statement noted that OJJDP would "attempt to make the best possible use of available funds by honoring commitments, *completing currently funded project activities,* and targeting remaining funds in narrow priority funding areas." 46 Fed.Reg. 33133, 33134 (1981) (emphasis added). It also stated that "[i]t is not in the best interest of the Federal government to begin or continue projects which cannot be completed with currently available funds . . . ." *Id.* Yet OJJDP did not warn the Law Center that its funding for pending litigation was in jeopardy in light of this policy or direct it not to begin new litigation.

On March 8, 1982 OJJDP announced that it disapproved of "any new litigation expenses" for lawsuits or other confrontational activities against federal, state or local governments. 47 Fed.Reg. 9933, 9937 (1982). Yet this language was ambiguous, and suggested that it concerned new lawsuits rather than new expenditures for existing litigation. Thereafter, in April 1982,

the Law Center applied for a no-cost extension of its grant period beyond September 30, 1983 in order to continue pending litigation that could not be completed within the grant period.

In light of new appropriations made by Congress to OJJDP for Fiscal Year 1982, the agency issued a "revised continuation policy" on June 25, 1982. The text of this policy was similar to that announced in March 1982. The agency announced that

the Office will not approve budgeted costs for any new litigation expenses on behalf of private parties or for suits against State and local governmental units. . . . Federal Juvenile Justice grant funds will not be used to pursue lawsuits or other confrontation activities against Federal, State or local governments. In any event, litigation which would start in Fiscal Year 1982 could not be completed before the termination of any existing grants.

47 Fed.Reg. 27633, 27637. It is unclear whether the limitation on "new litigation expenses" was intended to prohibit the use of funds to initiate new litigation or indicated a withdrawal of support for existing litigation. The statement that "grant funds will not be used to pursue lawsuits" against governmental agencies likewise is susceptible of two meanings. Yet the final sentence in the quoted passage notes that newly-begun litigation could not be completed within the grant period: not only does this suggest that the restriction was directed toward the use of funds for new lawsuits but perhaps also evidences the agency's awareness that the type of litigation performed by grant recipients is not the sort of activity that can be completed in the short-term. In any case, these statements did not constitute a sufficient warning to the Law Center that funding for its pending lawsuits would be terminated.

In August 1982, OJJDP at last granted the Law Center's request for a no-cost extension of its grant. This permitted the Law Center to continue to receive federal support for its litigation efforts through March 31, 1983. The grant adjustment no-

tice advised the Law Center that "no new litigation activities should be initiated and *all current litigation activities should be expedited to ensure that litigation is completed to coincide with the grant period end date.*" Appendix I to Complaint, at 6 (emphasis added). It also stated that "OJJDP is not obligated, nor intends, to continue funding the project after the grant terminated [sic] date of March 31, 1983." *Id.*

The Law Center had taken steps to wind down its litigation docket well before August 1982, but as the expiration of its grant neared some eleven cases remained which, for reasons beyond its control, could not be completed in time. In one case, *Holland v. Tipton County,* No. 82–2458 (W.D.Tenn.), action on pretrial motions was delayed pending reassignment of the case due to the appointment of the district judge to the Court of Appeals. In another case, *Rhodes v. Jadwin, No. 82–0437* (E.D.Mo.), the trial date was postponed from February 1983 to May 1983 by the court.

Harry F. Swanger, Director of the Law Center, made a request to Acting Administrator Regnery for continuation funding in January 1983. Regnery instructed Swanger to file a formal application for such funding, which he did on January 28, 1983. Despite Swanger's representations that the Law Center faced an imminent budgetary crisis and his plea for expedition, Regnery did not respond to the application for nearly a month. As a result, on February 25, 1983 Swanger wrote Regnery again, requesting prompt attention to the application for continuation funding and also seeking interim funding pending administrative resolution of the request for continuation funding. Finally, on March 9, 1983 Regnery informed Swanger by letter that OJJDP had rejected his request for "supplemental" (*i.e.* continuation) funding. On March 31, 1983 Regnery denied the request for interim funding. Regnery asserted that the agency was under no obligation to support the Law Center's remaining litigation and stated that the Law Center created its crisis by engaging in litigation efforts that could not be completed within grant periods.

■ This Court has jurisdiction over this action. While review of a decision by OJJDP to deny continuation funding would lie, upon exhaustion of administrative remedies, in the Court of Appeals, there is no administrative review procedure for the Law Center's claim for *interim* funding. Moreover, the juvenile plaintiffs' claims can only be heard in this Court, a matter that defendants concede. Furthermore, the relief sought in this action is different from—and more limited than—that which is the subject of the request for continuation funding pending with the agency. The request for continuation funding seeks monies that would allow the Law Center to continue its program. The claim before this Court is for just enough money to complete pending law suits. The amount of money that would be needed from OJJDP to see the Law Center through its existing docket could be reduced by the amount of any attorney's fees awards made to the Law Center as a result of successful cases. Similarly, should the Law Center be successful in its administrative request for continuation funding (which appears doubtful in light of the position the agency now evidently is taking in regard to the Law Center's activities), it therefore would have no further need for interim funding.

The injuries alleged are appropriately the subject of injunctive relief. If defendants are not enjoined from failing to provide interim funding and the Law Center is unable to continue its efforts in its various lawsuits, delay will necessarily ensue, to the irreversible prejudice of the juveniles on whose behalf those lawsuits were filed.

Plaintiffs make three arguments: (1) that for defendants to terminate funding of litigation that it once sponsored violates the due process rights of the juveniles on whose behalf that litigation was brought, (2) that OJJDP is estopped to deny funding to complete litigation undertaken in reliance on its assurances that continued funding would be provided, and (3) that Regnery's action denying interim funding violates the requirements of reasoned decisionmaking created by the Administrative Procedure Act and guarantees of substantive due process, in

that he gave no reasons for his decision. These arguments will be discussed *seriatim.*

There is no doubt that the right of the Law Center's juvenile clients to access to the courts, a right guaranteed by the due process clauses of the fifth and fourteenth amendments, will be infringed upon by a withdrawal of government support for their lawsuits. The question here is to what extent the government is obligated to continue to provide financial support for these cases. Plaintiffs analogize OJJDP's duty to the duty of a rescuer to carry through the rescue properly once rescue is undertaken. *See* W. Prosser, *The Law of Torts* § 56, at 342–45 (4th ed. 1971); *see also Veach v. City of Phoenix,* 102 Ariz. 195, 427 P.2d 335, 337 (Ariz.1967) (city has no duty to provide fire protection, but having assumed that responsibility, it may not discriminate among property owners with respect to provision of that service). By this reasoning, even though OJJDP had no duty to fund the juveniles' lawsuits in the first place, by entering into responsibility to fund those suits it obligated itself to make certain that those cases could be brought to conclusion.

The matter at hand is in the nature of those cases where a voluntary act may create a continuing duty. According to Prosser, where there is no duty to aid another, there is at least a duty to make sure that in the course of providing assistance nothing is done to make that person's situation worse. *Id.* at 343. Indeed, the termination of support at a crucial stage of litigation, such as settlement discussions, could place the juvenile plaintiffs at a tactical disadvantage.

 The duty to continue support exists here, and not in the case of other grant projects, as a result of the special protections given to the attorney-client relationship. The attorney-client privilege is one example of these protections. *See generally Attorney General v. Covington & Burling,* 430 F.Supp. 1117, 1120–21 (D.D.C. 1977); *see also, e.g., Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947) (work product privilege protects the strong "public policy underlying the orderly prosecution and defense of legal claims"). Interference with the attorney-client rela-

tionship is a common-law tort. Moreover, these same concerns are reflected in the Code of Professional Responsibility, which prohibits withdrawal from representation except in exceptional circumstances. ABA Code of Professional Responsibility, Canon 5. As a result, this case is distinguishable from *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), cited by defendants, where the Supreme Court rejected the claim of certain nursing home patients that they had a right under the Constitution for continued funding for their nursing home. That case involved the patients' request for a hearing before the government revoked the nursing home's authority to provide care at government expense under Medicare and Medicaid. The effect of the government's action was not to reduce or terminate the patients' benefits but simply to require them to use their benefits at another facility. 447 U.S. 785–86, 100 S.Ct. at 2475–76.

Special considerations govern the situation that exists when a third party, such as OJJDP, funds the costs of litigation. The Supreme Court in *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) invalidated a Virginia state prohibition on legal service organization support of lawsuits, yet not without noting a state's legitimate concern that "a law intermediary ... may control litigation or otherwise interfere with the rendering of legal services in a confidential relationship." 371 U.S. at 441, 83 S.Ct. at 342. The Code of Professional Responsibility counsels that changes in the way that legal services are supplied "do not result in loss of the professional independence of the lawyer." ABA Code of Professional Responsibility, EC 5–24.

 Plaintiffs also suggest that Regnery denied the Law Center's request for funding because of his political disagreement with the idea that the government should fund the type of lawsuits in which the Law Center is engaged, even though the Juvenile Justice Act authorized such litigation efforts. *See* 42 U.S.C. § 5634(a)(7). Regnery has confirmed that he does not con-

sider it an appropriate use of federal funds to bring suits on behalf of juveniles against state and local governments. Regnery Dep. at 48. To the extent that the denial of the Law Center's request was based upon Regnery's philosophical opposition to such activities, and to the extent that the lack of additional funding would disrupt the Law Center's lawsuits, Regnery's action constitutes an improper attempt to affect substantive outcomes pending before the courts. This is a violation of the litigants' due process rights, and contravenes the doctrine of separation of powers. *United States v. Klein,* 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871).

▬ Plaintiffs' estoppel arguments also have merit. Promissory estoppel will lie against the government where a plaintiff has relied reasonably upon a promise only if it does not work to override a statute or regulation, *Molten, Allen & Williams, Inc. v. Harris,* 613 F.2d 1176, 1178 (D.C.Cir.1980), and if the plaintiff can show that it is necessary to overcome an injustice and will not cause undue damage to the public interest. *Texas Oil & Gas Corp. v. Andrus,* 498 F.Supp. 668, 676 (D.D.C.1980), *rev'd on other grounds sub nom. Texas Oil & Gas Corp. v. Watt,* 683 F.2d 427 (D.C.Cir.1982). To estop OJJDP to deny interim funding of the Law Center's existing docket will not contravene any statute or regulation in effect when litigation was begun for the reason that such activity is entirely consistent with the objectives of the Juvenile Justice Act. There can be no doubt that interim funding is essential to avoid the injustice that otherwise would befall the juvenile clients of the Law Center. Moreover, it cannot be said that providing interim funding would cause undue harm to the public interest inasmuch as the amount of money at stake can only have an insubstantial effect upon the national fisc. Consequently, the only remaining question as to the estoppel argument is whether the Law Center reasonably relied on representations made by OJJDP that funding for its lawsuits would be assured.

All the facts demonstrate that OJJDP continually assured the Law Center, until August 1982, that support for its ongoing litigation would be maintained. Despite its scrutiny of and exercise of control over the Law Center's grant-funded activities, and its awareness of the Law Center's involvement in complex class-action cases, never did it advise the Law Center not to pursue such projects. After Section 228(a) was repealed, OJJDP's January 1981 policy repeated its assurances that all that would be necessary for continued funding would be a satisfactory evaluation. Nothing in its June 1981 policy warned the Law Center that support for litigation might be reduced. The June 1982 policy contained the ambiguous statement that OJJDP would not approve budgeted costs "for any new litigation expenses," and yet when the Law Center inquired of its grant monitor, Doyle Wood, as to the significance of this statement, he advised that new lawsuits could still be commenced over the following eight months provided that they arose from client contacts made before the date of that notice. Wood Dep. at 33–34.

There is nothing to indicate that the extent of the Law Center's litigation work was unreasonable in light of the terms of its grant. As noted above, the breadth of that work was well within the knowledge of OJJDP. Nothing suggests that the Law Center overextended itself—there is no evidence that while the Law Center was receiving funding it could not keep its programs within its budget. The problems that befall it now are not the result of too little money but too little time.

Citing *Jablon v. United States,* 657 F.2d 1064 (9th Cir.1981), defendants argue that the doctrine of estoppel may only be invoked to prevent the government from interposing a defense and cannot be used to create a cause of action, which it asserts the Law Center is attempting to do. The *Jablon* case was an action for money damages under the Tucker Act, 28 U.S.C. § 1346, by a physician who had accepted a commission to the Air Force but whose active duty orders were revoked in light of his arrest on a state drug offense. Although he never entered active duty and therefore did not receive Variable Incentive Pay, nonetheless he claimed he was entitled to such pay because a recruiter allegedly promised him

that the incentive pay was payable upon his taking the oath of office, an event which did occur. 657 F.2d at 1067. The Ninth Circuit ruled that while equitable estoppel could be invoked against the government, promissory estoppel could not be employed to create a cause of action because the United States had not waived its sovereign immunity with regard to a cause of action based on promissory estoppel under the Tucker Act. *Id.* at 1070.

Aside from the fact that *Jablon* is not binding precedent in this circuit, that case is distinguishable from the instant case in that the plaintiffs here do not seek money damages but injunctive relief to preserve the status quo. To the extent that this case can be analogized to an action sounding in contract, however, it is more like *Manloading & Management Associates, Inc. v. United States,* 461 F.2d 1299 (Ct.Cl.1972). In that case, a government contractor charged the United States with breach of contract for failing to renew a one-fiscal year contract it had with the government at the end of the fiscal year in spite of oral representations by the government at the bidding conference that "any prospective bidder should be assured that funds were available and that there would be no question about the renewal of the contract" for the next fiscal year. 461 F.2d at 1301. The government contended that a written option clause terming the contract "renewable, at the option of the Government" gave it an unrestricted right to renew the contract or not. *Id.* at 1300–01. The Court of Claims found that the oral statements made by the government representative resulted in an amendment renewing the contract at the end of the fiscal year. *Id.* at 1303. Likewise, in the instant case, the repeated assurances of OJJDP on which the Law Center relied in continuing its work provide the basis upon which the agency is estopped to deny funding for the completion of the Law Center's existing docket.

Finally, plaintiffs argue that Regnery's actions in denying the Law Center's request for interim funding were arbitrary and capricious, in violation of the Administrative Procedure Act and guarantees of substantive due process in that he failed to provide an adequate explanation of some legitimate underlying rationale. Defendants argue that there was no deficiency in Regnery's decision in that it was a matter committed to the agency's discretion, that he had made a determination that the Law Center's project did not meet his "developing priorities" for fiscal year 1983, and that it was also based upon the conclusion of the agency's general counsel that it had no "legal, moral, or ethical" responsibility to continue the funding. Regnery Dep. at 65, 69; Pl. Exh. 8 to Lauer Dep. (general counsel memorandum referencing that office's April 8, 1980 legal opinion).

It is not necessary to address this issue in light of the fact that plaintiffs' entitlement to the relief sought has already been determined. Nonetheless, Regnery's deposition testimony suggests that the Law Center's request for interim funding did not receive due consideration. Regnery was unable to state what his funding priorities were as of January 1983 when he met with Swanger or on March 9, 1983 when he issued his letter denying funding. Regnery Dep. at 25, 44. He admitted that OJJDP's fiscal year 1983 program priorities have not been promulgated. *Id.* at 72. Some of this uncertainty is reasonably attributable to the fact that Regnery had newly begun his position as Acting Administrator; moreover, he had the August 1982 decision by the prior Administrator to rely upon. Yet in his deposition Regnery was unable to state unequivocally that he took into consideration the crisis facing the Law Center and its clients in denying the request for interim funding. The significance of the request for interim funding, as opposed to the request for continuation funding, apparently was lost on Regnery. *Id.* at 31–32, 41–42. He could not state that he specifically considered that the denial of the interim funding request would have adverse effects on the Law Center's pending litigation. *Id.* at 31–35. Nor did he discuss the matter with Doyle Wood, the Law Center's grant monitor, who was well familiar with its program and needs. Wood Dep. at 53. It would appear that the potential for irreparable harm to befall the Law Center's clients was

the main issue involved in the request for interim funding, and therefore a question that demanded more attention than that given to it by Regnery. In any case, the Court already has determined that plaintiffs are entitled to the relief they seek.

An injunction shall be entered prohibiting defendants from denying the Law Center a reasonable amount of funding sufficient to allow it to continue to completion the prosecution of ten enumerated civil actions, pending defendants' final administrative decision on the Law Center's application for continuation funding. "Completion" of the actions shall be the point at which final judgment is entered in the courts in which the actions are now pending. The injunction does not embrace appeals of such judgments where the appeals have not yet been filed, but does extend to post-judgment relief. It does include interlocutory appeals. In the case of matters now pending in appellate courts, the provisions of the injunction extend to proceedings in a trial court following remand, if any, but only through final judgment in the trial court and post-judgment relief. Requests for such funding shall be submitted to this Court for approval. In determining whether such amounts are reasonable, the Court will consider whether the Law Center has taken all possible measures to mitigate the amount of funds required from the government. Such measures shall include applying funds received by the Law Center through attorney's fees awards to current litigation costs and relying on the assistance of other counsel wherever possible. It is incumbent on the Law Center, to the extent of its ability to do so, to avoid unnecessary delay in the litigation of its cases. Should plaintiffs ultimately be unsuccessful in their application for continuation funding, through the administrative process and review in the United States Court of Appeals, they may move to modify this Court's injunction to provide for additional interim funding, if appropriate. An Order and an Injunction consistent with the foregoing accompany this Memorandum Opinion.

## ORDER

Upon consideration of the matters adduced at the hearing on the merits of this case and the materials filed by the parties, consistent with the Memorandum Opinion and the Injunction entered in this case this date the Court hereby orders the following:

1. The injunctive relief requested by plaintiffs in their complaint, *i.e.*, that defendants be permanently enjoined from withholding funding from plaintiff National Juvenile Law Center, Inc. in sufficient amounts to permit it to maintain and complete pending litigation brought pursuant to the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. § 5601 *et seq.*, shall be granted by the Court, except that the relief awarded at this time is provided only pending administrative action upon and review in the United States Court of Appeals of plaintiff's application to defendants for continued funding.

2. Requests for specific amounts of funding, consistent with the provisions of the Memorandum Opinion and the Injunction accompanying this Order, shall be submitted by plaintiff National Juvenile Law Center, Inc. to the Court for approval. Any response that defendants may have as to the reasonableness of such requests must be submitted to the Court within 10 days of the filing of plaintiff's requests.

3. To avoid undue administrative burden upon the Court and the parties, the Court requires that funding requests be submitted no more frequently than each three months and pertain to an equal period of time.

4. Defendants' motion to dismiss or for summary judgment shall be and hereby is denied.

5. Should plaintiff National Juvenile Law Center, Inc. ultimately be unsuccessful in its application for continuation funding from defendants, through the administrative process and review in the United States Court of Appeals, plaintiffs may move to modify this Court's Injunc-

**1330**

tion to provide for additional interim funding, if appropriate.

6. The Court is willing to entertain any stipulation or consent judgment into which the parties should wish to enter in light of the Court's decision.

7. This cause stands closed.

SO ORDERED.

## INJUNCTION

In accordance with the terms of the Memorandum Opinion and the Order entered in this case this date, defendants, Alfred S. Regnery and the Office of Juvenile Justice and Delinquency Prevention, shall be and hereby are enjoined from withholding reasonable funding from plaintiff National Juvenile Law Center, Inc. in sufficient amounts to permit it to maintain and complete pending litigation in the herein-enumerated civil actions brought pursuant to the Juvenile Justice and Delinquency Act of 1974, 42 U.S.C. § 5601 *et seq.* This Injunction shall remain effective until such time as a final decision, through the administrative process and review in the United States Court of Appeals, is reached upon the application of plaintiff National Juvenile Law Center, Inc. for continuation funding from defendant Office of Juvenile and Delinquency Prevention, filed in January 1983. This Injunction pertains to the funding of the following civil actions:

*Santana v. Collazo,* No. 75–1187 (D.P.R.)

*Cruz v. Collazo,* No. 77–830 (D.P.R.)

*Benitez v. Collazo,* No. 77–2262 (D.P.R.)

*Napier v. Cornett,* No. 79–255 (E.D.Ky.)

*Allsup v. Knox,* No. 79–830 (E.D.Ky.)

*Hensley v. Broughton,* No. 80–32 (E.D. Ky.)

*Coleman v. Zimmerman,* No. 81–2215 (E.D.Pa.)

*D.L.B. v. Ahr,* No. 82–0638 (E.D.Mo.)

*Holland v. Tipton County,* No. 82–2458 (W.D.Tenn.)

*White v. Tennessee,* No. 28 (Tenn.App.)

The Court will entertain a modification of this Injunction upon an appropriate consent motion of the parties.

SO ORDERED.