NATIONAL JUVENILE LAW
CENTER, INC., et al.

v.

Alfred S. REGNERY, Acting Administrator, Office of Juvenile Justice, et al., Appellants.

Nos. 83–1644, 83–1985 and 83–2236.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 14, 1984.

Decided June 22, 1984.

As Modified on Rehearing sua sponte
Oct. 15, 1984.

Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the briefs were filed, and Mark H. Gallant, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Richard Laird Hart, Washington, D.C., with whom David J. Cynamon, Washington, D.C., was on the brief, for appellees.

Before WRIGHT, BORK and SCALIA, Circuit Judges.

Opinion for the court PER CURIAM.

PER CURIAM:

In 1978 and 1980 the federal government awarded grants to the National Juvenile Law Center (the "Law Center") which were to be used to finance litigation on behalf of juveniles aimed at improving the system of juvenile justice in this country. In the spring of 1983 the government refused to extend new grants or to continue to fund the Law Center after the last of its previous grants expired on March 31, 1983. The Law Center and two of its clients in the suits it had brought commenced this action in the District Court for the District of Columbia, alleging that the government was legally obligated to continue to provide funding until the litigation that had been started with the previous grants was completed.

The plaintiffs advanced three arguments in the District Court in support of their plea for continued funding. First, they claimed that the government was bound under principles of promissory estoppel to continue funding suits already in progress. Second, they argued that their clients' rights under the Due Process Clause of the Constitution had been infringed by the government's withdrawal of the allegedly promised future funding. Third, they alleged that what they characterize as the government's attempt to withdraw funding while the underlying suits were at critical stages was an unconstitutional attempt by the Executive Branch to control the outcome of pending suits, in violation of the doctrine of separation of powers. See United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872).

On May 26, 1983 the District Court granted permanent injunctive relief to the plaintiffs, ordering the government to fund the pending litigation. National Juvenile Law Center, Inc. v. Regnery, 564 F.Supp. 1320 (D.D.C.1983). The government appealed to this court.[1] We reverse the District Court's judgment.

## I. FACTUAL BACKGROUND

The Law Center is a nonprofit legal firm specializing in juvenile law. In 1978 the Office of Juvenile Justice and Delinquency Prevention (OJJDP) awarded it a grant of $699,764 to conduct specified litigation on behalf of juvenile offenders from October 1, 1978 to March 31, 1980. The litigation efforts seem to have generally focused on the problems caused by incarcerating juveniles, and especially aimed at attacking the practice of confining juveniles along with adults in adult detention facilities.

---

1. The government alleges that this case was decided on cross-motions for summary judgment. Appellees, on the other hand, claim that they never moved for summary judgment. Brief for Appellees at 34 n. 1. It is not clear to us why appellees dispute the government's characterization of the case as having been decided on summary judgment. The District Court's opinion refers to matters outside the pleadings and thus could not be a judgment on the pleadings, see Fed.R.Civ.P. 12(c), and it is undisputed that no trial was held. We therefore construe the District Court as having granted summary judgment. At any rate, the District Court held that "[t]he facts generally are not disputed," National Juvenile Law Center, Inc. v. Regnery, 564 F.Supp. 1320, 1322 (D.D.C.1983), and we rely only on undisputed facts in this opinion.

In early 1980 the Law Center realized that a considerable portion of the grant remained unspent. It accordingly requested and received a six-month "no cost" extension—*i.e.*, an extension of the time during which it could spend already granted funds. During this period the Law Center submitted a second grant application, and in November 1980 received an additional grant of $997,071 that was to cover the period from October 1, 1980 through September 30, 1982.

For aid in understanding the ensuing events, we will speak of three different kinds of funding that a grantee could claim from the government. First is what we will call "new funding," which is a grant of money that the grantee could use generally to further its activities. In the case of the Law Center, it would presumably use new funding grants to continue to litigate old suits, institute new suits, or involve itself in other activities permitted by the terms of the grant. The grants the Law Center received in 1978 and 1980—like all the grants given by OJJDP—were "new funding" grants. Second is "continuation funding," which is funding that the grantee needs at a given time to continue activities already started. For the Law Center, continuation funding would enable it to continue to litigate cases already brought.[2] Third is "interim funding," which is continuation funding that would enable the grantee to continue its activities while the grantee's applications for other kinds of funding are pending before the agency. For the Law Center, interim funding would enable it to continue to litigate pending suits until OJJDP could pass on its applications for new or continuation funding. In other words, "interim funding" differs from continuation funding in that it lasts only until pending applications for funding are finally resolved.

Armed with this vocabulary, we can recount the remaining events that led to the current controversy. By early 1982 the Law Center realized that it would not spend all of its budgeted funds by the September 30, 1982 deadline given in its 1980 grant. On April 28, 1982 the Law Center accordingly requested a six-month, no-cost extension of its 1980 grant. In August it was informed by OJJDP that the request had been granted and its deadline for spending the already-budgeted funds extended to March 31, 1983.

On January 28, 1983 the Law Center applied for a renewal of its grant. By February 25, 1983 OJJDP had not yet acted on the grant request. Therefore the Law Center on that date sent a letter to OJJDP. The letter sought immediate action on the grant application, noted the Law Center's intention to pursue administrative remedies in the event of a denial, and requested interim funding for the period from the March 31 expiration of its prior grant until a final decision on its application.

The administrative remedies to which the Law Center referred evidently encompass a hearing before the agency pursuant to 42 U.S.C. § 3783(b) (1982)[3] (unless otherwise noted, all references to Title 42 of the United States Code are to the 1982 edition) and a rehearing pursuant to 42

---

**2.** The outer boundaries of continuation funding are unclear—whether it would continue until judgment in pending cases, until enforcement efforts on behalf of favorable judgments were completed, or for some other duration. For present purposes we need not precisely define these outer limits.

**3.** Section 3783(b) provides that "[i]f * * * any grant application * * * has been rejected * * * or an applicant * * * has been denied a grant or has had a grant, or any portion of a grant, discontinued, terminated or has been given a grant in a lesser amount that [*sic*] such applicant believes appropriate * * *, the [agency] is authorized and directed to hold such hearings or investigations, including hearings on the record in accordance with section 554 of title 5, at such times and places as necessary, following appropriate and adequate notice to such applicant; and the findings of fact and determinations made with respect thereto shall be final and conclusive * * * *." Section 3783 is not by its terms applicable to OJJDP, but 42 U.S.C. § 5672(a) specifically makes its provisions applicable to OJJDP.

U.S.C. § 3783(c).[4] Presumably, the Law Center intended also to invoke judicial review of any denial of its application for new funding, and sought the interim funding for the entire period until administrative and judicial reviews were completed. *See* 42 U.S.C. §§ 3784, 3785 (judicial review available in Court of Appeals for decisions of certain Department of Justice agencies); *id.* § 5672(a) (making §§ 3784 and 3785 applicable to OJJDP).

By letter dated March 9, 1983 OJJDP informed the Law Center that its application for new funding would be denied. In mid-March OJJDP orally notified the Law Center that its request for interim funding had been denied. *See* letter from Mona Lyons and John W. Karr to OJJDP, March 29, 1983, Joint Appendix, ("JA") at 19. On March 29 the Law Center appealed for reconsideration of the denials and alternatively requested a hearing. OJJDP replied on March 31 that it would arrange for a hearing, but that it would take 60–90 days to do so "with the full cooperation of all parties." *See* letter from OJJDP to Karr & Lyons, March 31, 1983, JA 23. Faced with the March 31 cutoff of the previous grant and fearful that a cutoff of funds would doom currently pending cases, the Law Center and two of its clients filed this suit in the District Court.

On May 26, 1983 the District Court issued the injunction here under review. The District Court believed that it had jurisdiction only over appellees' claim for interim (as opposed to continuation) funding, *see* 564 F.Supp. at 1325, because of the existence of the statutory review scheme culminating in Court of Appeals review outlined above. *See* 42 U.S.C. §§ 3783–3785. Therefore, the court only ordered OJJDP to supply interim funding pending completion of administrative and judicial review of the application for new or continuation funding. However, the District Court's reasoning indicates that it granted the interim funding because it felt that the promissory estoppel, due process, and separation of powers arguments established that appellees were entitled to continuation funding. In what follows, we hold that the District Court was incorrect in its holding (at least as to the individual appellees) that it had jurisdiction only over their claim to interim funding. We also hold that the District Court erred in its finding that appellees were entitled to continuation funding.

## II. CONSTITUTIONAL CLAIMS OF THE INDIVIDUAL PLAINTIFFS

### A. *Jurisdiction*

■ The government alleges that the District Court lacked jurisdiction over the individual appellees' claims. It bases its argument on the administrative review procedure established in OJJDP's governing statute. In particular, 42 U.S.C. § 3783(b) provides that administrative appeal is available for an "applicant or grantee" whose grant application has been "denied," or whose grant has been "discontinued, terminated or * * * been given * * * in a lesser amount that [*sic*] such applicant believes appropriate." As stated above, a disappointed grantee or applicant may then petition for a rehearing pursuant to Section 3783(c), followed by judicial review of any "final action" in the Court of Appeals pursuant to Section 3785. The government argues that, because Section 3785(a) provides this special avenue of review only for "applicant[s] or recipient[s]" of grants, Congress should be understood as having intended to preclude review at the behest of indirect beneficiaries such as the individual plaintiffs here. In short, according to the government, the individual plaintiffs have no claim because the statute grants

---

4. Section 3783(c) provides that if a grant recipient "is dissatisfied with the findings and determinations of the [agency], following notice and hearing provided for in subsection (a) of this section, a request may be made for rehearing, under such regulations and procedures as [the agency] may establish, and such recipient shall be afforded an opportunity to present such additional information as may be deemed appropriate and pertinent to the matter involved."

them no private right of action. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

We hold that the District Court did have jurisdiction over the constitutional claims of the individual plaintiffs, for those claims do not depend on the implication of any private right of action. Rather, the individual plaintiffs claim that the government's failure to provide continuation funding was a deprivation of their property or liberty without due process of law, and a violation of the constitutional principle of separation of powers. There can be no doubt that the District Court has federal question jurisdiction to hear the two constitutional claims. We accordingly proceed to the merits of those claims.

### B. *Due Process*

As we understand it, appellees (wisely) do not claim that they had a due process right to government funding of their litigation *ab initio*. Rather, they claim that once the government had begun to provide funding they developed an expectation interest in continued government funding. When OJJDP cut off further grants they were allegedly deprived of this expectation interest without due process of law. The individual appellees' claim in this respect is stronger than that of the Law Center because the Law Center at least arguably received a post-deprivation remedy (the administrative review proceeding); it is undisputed that the individual appellees had no such post-deprivation remedy available to them.[5]

We hold that appellees have failed to make out a due process violation. Their claim hinges on the proposition that they had an expectation interest sufficient to amount to a liberty or property interest under the due process clause in continuation funding. This interest could only arise from some promise that the government made to them at some time in the course of their relationship. Yet, as we shall see, no such promise was ever made. Therefore, no expectation (or at least no reasonable expectation) of continued government funding arose. For this reason we need not reach the issue whether any such expectation would have implicated a liberty or property interest. Rather, we need only hold—for the reasons stated below—that appellees have failed to show any reasonable basis for the existence of such an expectation interest.[6] We find little or no evidence that the government ever promised appellees it would provide continuation funding. To the extent that we can find such evidence, the government's unequivocal statements on a number of occasions that it would *not* be bound to continue funding appellees rendered unreasonable any attempt by appellees—who were represented by sophisticated counsel, the Law Center—to rely on such promises. It is useful briefly to recount the actions on which appellees support their allegations of a promise and of a reasonable expectation.

1. *Congressional intent.* At the time the Law Center received its first grant in

---

5. We are treating appellees' claims as procedural due process claims. Their filings and the proceedings in the District Court suggest at times that they believe instead that their claim is a substantive due process claim. Appellees cite Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and other "right to privacy" cases in support of this claim. We find that these cases provide no support for a substantive due process claim in this case. Accordingly, we decline to hold that it is unconstitutional for the

government to terminate funding to a grantee in accordance with the terms of the grant.

6. Obviously, there is a substantial similarity between the elements of a promissory estoppel claim—a promise and reasonable reliance thereon—and the elements of a reasonable expectation interest in discretionary government funding. Our discussion of the factual allegations appellees make in support of their due process claims will accordingly make occasional reference to "reliance" as well as to "expectation."

1978, Section 228(a) of the governing statute provided:

> In accordance with criteria established by the Administrator, it is the policy of Congress that programs funded under this subchapter shall continue to receive financial assistance providing that the yearly evaluation of such programs is satisfactory.

42 U.S.C. § 5638(a) (1976). *Congress repealed this provision in December 1980.* Pub.L. No. 96–509, § 14(a)(1), (2), 94 STAT. 2765 (1980). Nonetheless, appellees presumably believe the statute constituted a promise by Congress that they would receive continuation funding.

2. *OJJDP's continuation funding policy.* In the period from 1978 to 1983 OJJDP itself toyed with the development of a continuation funding policy for all of its grantees. On August 8, 1980—before Congress repealed Section 228(a)—OJJDP announced that it intended to adopt a policy that would make certain projects "eligible for continuation funding" based on certain general criteria "and any additional criteria for continuation specified in program continuation announcements issued by [OJJDP] * * *. Projects that are continued will be funded at a level necessary to sustain essential project activities whether below, at, or above prior funding levels as OJJDP determines to be appropriate and necessary to successful continuation." 45 Fed.Reg. 52947 (Aug. 8, 1980). The notice went on to say that "OJJDP will announce annually * * * the eligible continuation program areas, * * * and any additional criteria which applicants must meet in order to qualify to receive continuation funding." *Id.*

On January 22, 1981 OJJDP promulgated the policy announced earlier. The agency noted that "Congress never intended that Juvenile Justice Act categorical programs be considered entitlement programs. However, OJJDP believes that Congress did intend, and has not removed the Office's ability to promulgate, a policy permitting long term funding under criteria estab-

lished by OJJDP." 46 Fed.Reg. 7109, 7110 (Jan. 22, 1981). The language in which the new policy was couched essentially mirrors that of the August 8 notice, with the following additional language: "Eligible applicants meeting the general continuation criteria will be considered for refunding provided that they have received a satisfactory evaluation * * *." *Id.* at 7111.

This policy remained in effect for only six months. The new administration that took office in January 1981 sought to phase out OJJDP in its first budget. On June 26, 1981 the agency issued a new continuation funding policy anticipating its own imminent demise. 46 Fed.Reg. 33133 (June 26, 1981). The new policy declared that, in light of changed circumstances, the January 22 policy "will no longer be useful and is canceled by this regulation." *Id.* at 33134. The new policy statement asserted that OJJDP would

> attempt to make the best possible use of available funds by honoring commitments, completing currently funded project activities, and targeting remaining funds in narrow priority funding areas. It is not in the best interest of the Federal government to begin or continue projects which cannot be completed with currently available funds * * *.

Congress ultimately balked at the Administration's plan to eliminate OJJDP. Consequently, on March 8, 1982 the agency once again attempted to set out its funding policy. 47 Fed.Reg. 9933 (March 8, 1982). Its new policy was that

> the Office will not approve budgeted costs for any new litigation expenses on behalf of private parties or for suits against State and local governmental units. * * * Federal juvenile justice grant funds will not be used to pursue law suits or other confrontation activities against Federal, State or local governments. In any event, litigation which would start in Fiscal Year 1982 could not be completed before the termination of any existing grants.

*Id.* at 9937. The saga of OJJDP's funding policy concludes with the agency's issuance of a final "revised continuation policy" in the summer of 1982. 47 Fed.Reg. 27633 (June 25, 1982). This statement repeated the language quoted above from the March 8 policy statement. *Id.* at 27637.

3. *The language of the grant documents.* Another logical source of alleged government promises would be the grant documents themselves, for these documents represented the primary formal agreements between OJJDP and the Law Center.

The 1978 and 1980 grant award documents both included the following provision:

> This award in no way commits LEAA [the Law Enforcement Assistance Administration] to future funding of this project. Any such future consideration will depend upon the achievements of the initial funding period and the availability of funds.

*See* JA at 36 (1978 document); 564 F.Supp. at 1322 (1980 document). Special Condition No. 12 in the 1980 grant award said:

> OJJDP is developing a continuation funding policy which may affect your choice of litigation. The funding policy may place limits on the length of Federal support and should be taken into consideration in decisions to initiate long-term litigation.

564 F.Supp. at 1322.

In awarding the Law Center the August 1982 six-month no-cost extension of its 1980 grant, OJJDP advised the Center that

> no new litigation activities should be initiated and *all current litigation activities should be expedited to ensure that litigation is completed to coincide with the grant period end date.* * * *

*See* 564 F.Supp. at 1325 (emphasis by District Court). It also stated that "OJJDP is not obligated, nor intends, to continue funding the project after the grant terminated [*sic*] date of March 31, 1983." *Id.*

4. *Other communications between OJJDP and the Law Center.* Before the 1978 grant expired the Law Center's Executive Director, Harry Swanger, had written to OJJDP suggesting that, because grant-supported litigation activities were still pending in the courts, OJJDP was legally bound to renew the Law Center's original grant. *See* memorandum from Thomas J. Madden, General Counsel, Office of Justice Assistance, Research and Statistics (OJARS), to Ira H. Schwartz, OJJDP Administrator, April 9, 1980, JA at 128. Mr. Schwartz, the then-Administrator of OJJDP, requested an opinion from the General Counsel of OJARS. The opinion, according to Schwartz, "suggested that the Office had no legal, ethical or moral responsibility to provide continued funding for litigation in progress." 564 F.Supp. at 1323–1324. The substance of the opinion— although perhaps not its precise wording— was communicated to the Law Center. *See* Deposition of Harry F. Swanger, April 26, 1983, JA at 139, 148–149.

Schwartz himself stated that he found the opinion "unclear" and inadequate; he stated that he had difficulty with the report's conclusion that OJJDP had the *power* to develop a continuation policy notwithstanding its conclusion that grantees were not· *entitled* to such a policy. At any rate—and more relevant for our purposes than the quality of the General Counsel's opinion—the District Court found that Schwartz informed the Law Center that he "was not entirely in agreement with the conclusion of the opinion regarding OJJDP's obligation to provide future funding * * *." 564 F.Supp. at 1324. He also advised the Law Center "that he planned to move toward developing a litigation policy," but that policy "never was developed because of the change in the presidential administration." *Id.*

Throughout the time period discussed above OJJDP exercised some control over the Law Center's activities. It refused to allow the Law Center to use the grant

funds to prosecute damage actions and determined which states would be "target" states for the Law Center's class action cases. 564 F.Supp. at 1322–1323. After the June 1982 policy statement included the warning that OJJDP would not approve funding for any new litigation expenses, the Law Center asked its monitor at OJJDP, Doyle Wood, what the meaning of this statement was. Mr. Wood responded "that new lawsuits could still be commenced over the following eight months provided that they arose from client contacts made before the date of that notice." *Id.* at 1327.

5. *Analysis.* We are unable to find in any of the categories of dealings between the government and the Law Center—or in all of them together—any promise that could give rise to an expectation interest in continuation funding.

We begin with the statute involved—Section 228(a). Whatever its relevance may be in an administrative review of a grant denial pursuant to 42 U.S.C. §§ 3783–3785, we have difficulty understanding appellees' argument that it has any relevance in this case. To make Section 228(a) relevant appellees' argument would have to be that they relied on it as a "promise" by Congress during the period it was in force (until the end of 1980). This reliance would render such a "promise" enforceable at the time, and no subsequent unilateral action by Congress (such as repeal of the statute) could then render it unenforceable. Unfortunately, the language of the statute does not resemble the language of promise and only with great strain could it be read as creating a contractual entitlement in appellees. We therefore conclude that it fails to provide any significant support for appellees' claims in this case.

None of the agency's Federal Register announcements contain even a plausible approximation of the language of promise or obligation. And the repeated references to the agency's ability to enact new rules or to include or exclude specific programs

from the ambit of the continuation funding policy on a year-to-year basis strongly imply that no unequivocal promise was intended. Again, even if there were some language that conceivably sounded promise-like, we would doubt the reasonableness of a party's reliance on such language in this context. OJJDP had the responsibility of advancing a number of different goals through its grant programs, as specified in its enabling statute. *See* 42 U.S.C. §§ 5602(b), 5634(a). Any party receiving OJJDP grants should have realized that the agency would from time to time alter its views as to how to advance those goals most effectively with the necessarily limited resources at its disposal. Changes in agency policy do not represent some kind of forbidden political intrusion into the administrative process, but rather are the expected exercise of judgment by any agency to which Congress has delegated authority for making policy. This does not imply that *all* changes in agency policy are appropriate; naturally a given agency must obey the substantive and procedural constraints that the Constitution and Congress impose. But it does imply that changes in agency policy should be expected over a period of time. Grant recipients should therefore be on the alert for such changes and grantee reliance on continued indefinite funding in the face of grants that were themselves explicitly stated to be for set periods of time is in general unreasonable.

We find little evidence of any promise in the direct dealings between OJJDP and the Law Center—either in the grant documents themselves or in the other direct communications between the parties. The documents themselves of course, with their categorical statements that "[t]his award in no way commits LEAA to future funding of this project," *see* JA at 36, make no such promise, but rather detract (to say the least) from the reasonableness of appellees' alleged reliance on promises they claim to find elsewhere in this record.

Finally, the direct communications between OJJDP and the Law Center provide

no support for the existence of a promise. The record indicates that Mr. Schwartz may have believed that the legal opinion prepared at his request was wrong in concluding that OJJDP had no legal or moral obligation to provide continuation funding. But Mr. Schwartz himself does not aver in his affidavit that he made a clear or unequivocal promise of continued funding to the Law Center. Moreover, any reliance by appellees on a perceived promise—if it were made—would have been clearly unreasonable, for a number of items in the record explicitly *disavow* the existence of such a promise: aside from the boilerplate clauses in the grant documents, the legal opinion itself (the essential contents of which were undisputedly known to appellees) indicates that no such promise had been made at least as of late 1980. Given these disavowals, appellees would have had good reason to doubt that any perceived promise was sufficiently firm to justify reliance.

The supervision by OJJDP—and, in particular, Mr. Wood's approval of the institution of new litigation in 1982—also do not support appellees' contention that a promise was made. OJJDP's supervision of Law Center projects seems to be just the kind of ordinary supervision that a grantor agency would be expected to exercise over its grantees, and we would be extremely reluctant to interpret such routine supervision as a promise that funding would be continued beyond the period specified in the grant. At any rate, Mr. Wood's actions themselves do not indicate unambiguously that he approved of litigation that would extend beyond the grant termination date. His statement in 1982 that "new lawsuits could still be commenced over the following eight months" does not state a position one way or the other on whether any litigation that could not be completed by the grant termination date would be permissible. Moreover, there is no evidence that Mr. Wood had authority (or held himself out to have authority) to commit the agency to such continued funding. *Cf. National Treasury Employees Union v. Reagan,*

*supra,* 663 F.2d 239, 249 (D.C.Cir.1981) (estoppel only runs against the government when the official involved has acted within the scope of his authority); *Molton, Allen & Williams, Inc. v. Harris,* 613 F.2d 1176 (D.C.Cir.1980) (same). Finally, any reliance on Mr. Wood's approval of new litigation as some kind of promise of continuation funding has to be considered in the light of the explicit limitations in the grant documents, the legal opinion, and the Federal Register notices warning grantees not to begin new litigation projects that could not be completed before the grant termination date. In the context of these various factors disclaiming any promise, reliance on Mr. Wood's approval as a promise would have to be seen as unreasonable.

The only argument appellees could muster in their behalf would be something like the following: Granted that the record contains no unequivocal promise of continuation funding. Granted that reliance on the communications discussed above as promises would have been unreasonable. Granted that the record certainly could not be construed to give *all* OJJDP grantees a promise of continued funding merely because continuation policies were announced (and later withdrawn) in statutes or regulations. Nonetheless, this record should be construed to contain a promise of continued funding to appellees because of the unique purpose of their particular grant (to institute large-scale class action litigation), a purpose well understood by all parties to the grant.

According to this argument, everyone involved knew or should have known at the time the grants were made that the kind of institutional reform litigation for which the grants were intended often lasted years from filing of complaint to final enforcement of judgment. Moreover, everyone involved should have known that to abandon such litigation once begun could easily lead to irreparable injury to the plaintiffs (who claim they may be left bound by unfavorable judgments). Therefore—so the argument goes—it was reasonable for the indi-

vidual appellees and the Law Center to believe that, when the government promised to provide them with some funding, it thereby committed itself to ' see them through the litigation. Even if a particular government grant does not ordinarily commit the government to continue funding the grantee indefinitely, a government grant in these circumstances should be taken to commit the government to continuation funding (at least). And reliance on such a government promise would of course be reasonable: indeed, it would be unreasonable to believe that the government would withdraw funding knowing the possibly irreparable injury that would ensue.

We find this argument unconvincing. It is true that courts in dealing with private promissory estoppel cases have occasionally construed transactions to constitute promises when manifest injustice would otherwise result. *See, e.g., Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267 (1965). And it cannot be denied that equitable factors play an important role in determining the outcome of promissory estoppel cases. But, assuming arguendo that the standards applicable to promissory estoppel should control the use of estoppel to create a promise giving rise to an expectation interest in a case brought under the due process clause, we are unable to find that the equitable factors indeed do militate so strongly toward appellees that the court should strain to find a promise where none is evident.

First, the equities in favor of appellees are not so strong as the above account might suggest. The irreparability of their injuries would seem to arise from the possibility that they may be bound by judgments in cases that have been abandoned through lack of funds. This possibility seems unlikely to us: if appellees' counsel is unable to continue to litigate a suit because the government cut off funding, we suspect that a voluntary dismissal without prejudice under Rule 41(a)(2) of the Federal Rules of Civil Procedure would be available. Moreover, it is possible that—at least in some of the pending suits that are near judgment—alternate counsel could be found.

On the government's side, strong considerations of equity and of public policy militate against creation of an expectation interest by estoppel. Separation of powers concerns—which traditionally have restricted the availability of estoppel against the government, *see* Note, *Equitable Estoppel of the Government,* 79 COLUM.L.REV. at 565–570 (1979)—urge extreme caution in finding an estoppel on the basis of facts like these. Congress has given OJJDP power to award grants for set periods of time and in accord with set procedures. *See* 42 U.S.C. § 5635 (providing for approval of grant applications by OJJDP Administrator if such applications contain certain set information). Nowhere has OJJDP been authorized to make the kind of indefinite, open-ended award that appellees argue we should find in this case. To permit OJJDP to make such commitments without any apparent congressional authorization would threaten to aggrandize the power of the Executive Branch at the expense of Congress (which is entrusted with the Spending Power under Art. I, § 9, cl. 7 of the Constitution).

It is no wonder that Congress has not generally favored such long-term commitments. With the passage of time come changes in circumstances requiring more or less resources to be devoted to particular problem areas within an agency's domain. In addition come changes in an agency's perceptions as to the most effective ways to promote the goals committed to it by statute. *See* 42 U.S.C. §§ 5602(b), 5634(a) (stating congressional policies with respect to juvenile justice and purposes for which OJJDP may award grants). Finally, electoral changes can result in the installation of different viewpoints as to both what problems are most serious and which remedies are most effective in addressing them. The administrative process was designed to enable agencies to make all of these kinds

of changes, as long as they are done in an orderly fashion and in accordance with relevant legal requirements. If a particular administrator attempted to freeze the unfolding of the policymaking process at a particular time by making such long-term commitments, a reviewing court would be faced with a serious legal question. It follows that when the evidence is as equivocal as is the evidence in this case, we may not read a promise to so freeze the process into the record.

There is one further public policy consideration militating against creation of an expectation interest by estoppel in this case. The government's freedom to terminate funding at the end of grant periods may be in the interests of appellees themselves or others similarly situated in the long run. For appellees' theories would necessarily result in tying up government funds for lengthy periods of time, thereby making it harder for grant applicants like themselves to gain funding in the first place.

Accordingly, we are unable to find that the individual appellees have made out a reasonable expectation interest in this case: we cannot find where a promise was made and, in any event, we find that it would have been unreasonable for appellees to rely on the meager scraps of commitment to continuation funding that appear on this record. Essentially, appellees' quarrel is with the policy decisions made by OJJDP when the agency decided to cease funding their litigation. We neither approve nor disapprove of those decisions; we merely find that the decisions did not break any promise previously made to appellees.

### C. *Separation of Powers*

Individual appellees' final claim is that the government's withdrawal of funding in this case amounted to an unconstitutional violation of separation of powers principles by the Executive Branch, in that the Executive was thereby attempting to control the outcome of a specific case then pending in the courts. In support of this claim appellees cite *United States v. Klein, supra,* 80 U.S. (1 Wall.) at 146, 20 L.Ed. 519, where the Supreme Court questions the ability of Congress to "prescribe rules of decisions to the Judicial Department of the government in cases pending before it[.]" The *Klein* case further adverts to the "vital importance" of keeping the powers of each branch of government distinct, *see id.* at 147, 20 L.Ed. 519.

■ Appellees' reliance on the broad language in *Klein* is entirely misplaced. Pending cases are often affected by the actions of coordinate branches of government. For instance, the general rule is that, if Congress changes the law while a case is pending, the courts are obligated to apply the law as they find it at the time of judgment (including appellate judgment). *See, e.g., United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 316 n. 4 (2d ed. 1973). The Executive Branch may also control the outcomes of pending cases in some circumstances; the most obvious example is the power of the Executive as prosecutor to cease prosecuting a pending criminal case. Thus *Klein* could not possibly stand for the proposition that *any* attempt by the other branches to affect pending cases is unconstitutional. *See generally United States v. Sioux Nation of Indians,* 448 U.S. 371, 404–05, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1980) (recent discussion of *Klein* rejecting broad reading of the case).

■ In deciding this case we need not decide what the proper scope of the *Klein* holding is. In *Sioux Nation of Indians,* the Supreme Court noted two important features of the *Klein* holding: that Congress was mandating a result in favor of the federal government in a particular pending case and that Congress was attempting to dictate the rule of decision in the case. *See* 448 U.S. at 405, 100 S.Ct. at

2735. Commentators have urged that *Klein* stands for the propositions that Congress may not dictate how a court should decide a question of fact in a particular case and that Congress may not "bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds[.]" P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, *supra*, at 316. Regardless which of these views one accepts, the action of OJJDP in this case is unexceptionable. Moreover, as noted above it is not even clear on this record that OJJDP's action would in fact dictate the results of the pending lawsuits, for withdrawal of funding may not lead to adverse judgments on the merits against appellees in the underlying cases. Therefore, given that appellees have provided no authority for their broad construction of *Klein*, we decline to expand its principles as dramatically as they would wish. We hold that the District Court erred in finding OJJDP's refusal to award continuation funding unconstitutional under the doctrine of *United States v. Klein*.

### III. THE LAW CENTER'S CONSTITUTIONAL CLAIMS

The District Court also had federal question jurisdiction over the Law Center's constitutional claims, which are parallel to those raised by the individual appellees. The constitutional claims of the Law Center are in all respects identical to (or weaker than) the claims of the individual appellees, a conclusion which should not be at all surprising given that the relationship between the Law Center and the individual appellees w.., the extremely close relationship of attorney and client at the time of the events in question. We have already held that OJJDP had made no promise of continuation funding. Our discussion implicitly assumed that any promises made to the Law Center were made to its clients as well. Hence, our holding against the individual appellees on their due process claim would be inconsistent with a holding in favor of the Law Center on these claims,

since the issue of the existence of an expectation interest on the part of the Law Center is identical to the issue of the existence of such an interest on the part of its clients. Finally, we have held that the facts of this case do not bring into play the separation of powers concerns of *United States v. Klein*, thus rendering a claim by the Law Center on this theory as improbable as a claim by its clients. We therefore hold that the Law Center has failed to establish either of its constitutional claims.

### IV. PROMISSORY ESTOPPEL CLAIMS

Both the individual appellees and the Law Center asserted promissory estoppel claims to continued government funding. In our original opinion in this case, issued on June 22, 1984, we indicated that we had jurisdiction over the individual appellees' promissory estoppel claims. Accordingly, we reached the merits, and held that appellees had failed to make out the elements of promissory estoppel in this case. We noted a knotty jurisdictional issue as to whether the Law Center's promissory estoppel claims were precluded by virtue of the special administrative review procedure set out in OJJDP's enabling statute, but declined to reach that issue because it was clear that the Law Center's promissory estoppel claims were inextricable from those of the individual appellees: promises made to the clients would have been made through and to the Law Center, yet we had held no such promises were made. Thus, it was obvious that the Law Center could not prevail on its promissory estoppel claims.

Subsequent to issuance of our opinion and judgment in the above cases, the panel has concluded that novel and difficult issues concerning subject matter jurisdiction and waiver of sovereign immunity as to both the Law Center's and the individual' appellees' promissory estoppel claims were not adequately addressed. Ordinarily, we would confront those issues, whether or not raised by the parties. In this instance, however, we have elected to withdraw our original opinion while retaining the judg-

ment reversing the District Court. The lurking issues were not fully briefed by the parties. We are reluctant to render a decision on these important jurisdictional questions without the benefit of briefing and oral argument. The ordinary course would be to request further briefing and/or remand to the District Court for determination of important factual issues not apparent on the face of the record. In this case we have concluded that the conventional course would be unfair to the litigants. We have already made clear in our original opinion our view that the appellees lose on the merits of their promissory estoppel claims. Requiring them to participate in what to them must appear a pointless exercise would be inequitable. Nonetheless, because of doubts as to our jurisdiction over the promissory estoppel claims, our modified opinion does not address them on the merits.

## IV. CONCLUSION

For the reasons stated above, we reverse the District Court's judgment in favor of appellees. We express no opinion as to whether appellees may have legitimate claims against OJJDP of the kind adjudicable in the administrative review proceeding. However, we do find that the District Court erred in refusing to grant appellants' motion for summary judgment.

*Reversed.*