80 U.S. 128 (____)
13 Wall. 128
UNITED STATES
v.
KLEIN
Supreme Court of United States.

*134 Mr. Akerman, Attorney-General, Mr. Bristow, Solicitor-General, and Mr. C.H. Hill, Assistant Attorney-General, in support of the motion.
Messrs. Bartley and Casey, P. Phillips, Carlisle, McPherson, and T.D. Lincoln, arguing in this or similar cases against the motion.
*136 The CHIEF JUSTICE delivered the opinion of the court.
The general question in this case is whether or not the proviso relating to suits for the proceeds of abandoned and captured property in the Court of Claims, contained in the appropriation act of July 12th, 1870, debars the defendant in error from recovering, as administrator of V.F. Wilson, deceased, the proceeds of certain cotton belonging to the decedent, which came into the possession of the agents of the Treasury Department as captured or abandoned property, and the proceeds of which were paid by them according to law into the Treasury of the United States.
The answer to this question requires a consideration of the rights of property, as affected by the late civil war, in the hands of citizens engaged in hostilities against the United States.
It may be said in general terms that property in the insurgent States may be distributed into four classes:
1st. That which belonged to the hostile organizations or was employed in actual hostilities on land.
2d. That which at sea became lawful subject of capture and prize.
3d. That which became the subject of confiscation.
4th. A peculiar description, known only in the recent war, called captured and abandoned property.
The first of these descriptions of property, like property of other like kind in ordinary international wars, became, wherever taken, ipso facto, the property of the United States.[*]
The second of these descriptions comprehends ships and vessels with their cargoes belonging to the insurgents or *137 employed in aid of them; but property in these was not changed by capture alone but by regular judicial proceeding and sentence.
Accordingly it was provided in the Abandoned and Captured Property Act of March 12th, 1863,[*] that the property to be collected under it "shall not include any kind or description used or intended to be used for carrying on war against the United States, such as arms, ordnance, ships, steamboats and their furniture, forage, military supplies, or munitions of war."
Almost all the property of the people in the insurgent States was included in the third description, for after sixty days from the date of the President's proclamation of July 25th, 1862,[] all the estates and property of those who did not cease to aid, countenance, and abet the rebellion became liable to seizure and confiscation, and it was made the duty of the President to cause the same to be seized and applied, either specifically or in the proceeds thereof, to the support of the army.[] But it is to be observed that tribunals and proceedings were provided, by which alone such property could be condemned, and without which it remained unaffected in the possession of the proprietors.
It is thus seen that, except to property used in actual hostilities, as mentioned in the first section of the act of March 12th, 1863, no titles were divested in the insurgent States unless in pursuance of a judgment rendered after due legal proceedings. The government recognized to the fullest extent the humane maxims of the modern law of nations, which exempt private property of non-combatant enemies from capture as booty of war. Even the law of confiscation was sparingly applied. The cases were few indeed in which the property of any not engaged in actual hostilities was subjected to seizure and sale.
The spirit which animated the government received special illustration from the act under which the present case arose. We have called the property taken into the custody *138 of public officers under that act a peculiar species, and it was so. There is, so far as we are aware, no similar legislation mentioned in history.
The act directs the officers of the Treasury Department to take into their possession and make sale of all property abandoned by its owners or captured by the national forces, and to pay the proceeds into the national treasury.
That it was not the intention of Congress that the title to these proceeds should be divested absolutely out of the original owners of the property seems clear upon a comparison of different parts of the act.
We have already seen that those articles which became by the simple fact of capture the property of the captor, as ordnance, munitions of war, and the like, or in which third parties acquired rights which might be made absolute by decree, as ships and other vessels captured as prize, were expressly excepted from the operation of the act; and it is reasonable to infer that it was the purpose of Congress that the proceeds of the property for which the special provision of the act was made should go into the treasury without change of ownership. Certainly such was the intention in respect to the property of loyal men. That the same intention prevailed in regard to the property of owners who, though then hostile, might subsequently become loyal, appears probable from the circumstances that no provision is anywhere made for confiscation of it; while there is no trace in the statute book of intention to divest ownership of private property not excepted from the effect of this act, otherwise than by proceedings for confiscation.
In the case of Padelford we held that the right to the possession of private property was not changed until actual seizure by proper military authority, and that actual seizure by such authority did not divest the title under the provisions of the Abandoned and Captured Property Act. The reasons assigned seem fully to warrant the conclusion. The government constituted itself the trustee for those who were by that act declared entitled to the proceeds of captured and abandoned property, and for those whom it should thereafter *139 recognize as entitled. By the act itself it was provided that any person claiming to have been the owner of such property might prefer his claim to the proceeds thereof, and, on proof that he had never given aid or comfort to the rebellion, receive the amount after deducting expenses.
This language makes the right to the remedy dependent upon proof of loyalty, but implies that there may be proof of ownership without proof of loyalty. The property of the original owner is, in no case, absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of the property have passed into the possession of the government, and restoration of the property is pledged to none except to those who have continually adhered to the government. Whether restoration will be made to others, or confiscation will be enforced, is left to be determined by considerations of public policy subsequently to be developed.
It is to be observed, however, that the Abandoned and Captured Property Act was approved on the 12th of March, 1863, and on the 17th of July, 1862, Congress had already passed an act  the same which provided for confiscation  which authorized the President, "at any time hereafter, by proclamation, to extend to persons who may have participated in the existing rebellion, in any State or part thereof, pardon and amnesty, with such exceptions and at such time and on such conditions as he may deem expedient for the public welfare." The act of the 12th of March, 1863, provided for the sale of enemies' property collected under the act, and payment of the proceeds into the treasury, and left them there subject to such action as the President might take under the act of the 17th of July, 1862. What was this action?
The suggestion of pardon by Congress, for such it was, rather than authority, remained unacted on for more than a year. At length, however, on the 8th of December, 1863,[*] the President issued a proclamation, in which he referred to that act, and offered a full pardon, with restoration of all *140 rights of property, except as to slaves and property in which rights of third persons had intervened, to all, with some exceptions, who, having been engaged in the rebellion as actual participants, or as aiders or abettors, would take and keep inviolate a prescribed oath. By this oath the person seeking to avail himself of the offered pardon was required to promise that he would thenceforth support the Constitution of the United States and the union of the States thereunder, and would also abide by and support all acts of Congress and all proclamations of the President in reference to slaves, unless the same should be modified or rendered void by the decision of this court.
In his annual message, transmitted to Congress on the same day, the President said "the Constitution authorizes the Executive to grant or withhold pardon at his own absolute discretion." He asserted his power "to grant it on terms as fully established," and explained the reasons which induced him to require applicants for pardon and restoration of property to take the oath prescribed, in these words: "Laws and proclamations were enacted and put forth for the purpose of aiding in the suppression of the rebellion. To give them their fullest effect there had to be a pledge for their maintenance. In my judgment they have aided, and will further aid, the cause for which they were intended. To now abandon them would not only be to relinquish a lever of power, but would also be a cruel and astounding breach of faith... For these and other reasons it is thought best that support of these measures shall be included in the oath, and it is believed the Executive may lawfully claim it in return for pardon and restoration of forfeited rights, which he has clear constitutional power to withhold altogether or grant upon the terms which he shall deem wisest for the public interest."
The proclamation of pardon, by a qualifying proclamation issued on the 26th of March, 1864,[*] was limited to those persons only who, being yet at large and free from confinement *141 or duress, shall voluntarily come forward and take the said oath with the purpose of restoring peace and establishing the national authority.
On the 29th of May, 1865,[*] amnesty and pardon, with the restoration of the rights of property except as to slaves, and that as to which legal proceedings had been instituted under laws of the United States, were again offered to all who had, directly or indirectly, participated in the rebellion, except certain persons included in fourteen classes. All who embraced this offer were required to take and subscribe an oath of like tenor with that required by the first proclamation.
On the 7th of September, 1867,[] still another proclamation was issued, offering pardon and amnesty, with restoration of property, as before and on the same oath, to all but three excepted classes.
And finally, on the 4th of July, 1868,[] a full pardon and amnesty was granted, with some exceptions, and on the 25th of December, 1868,[§] without exception, unconditionally and without reservation, to all who had participated in the rebellion, with restoration of rights of property as before. No oath was required.
It is true that the section of the act of Congress which purported to authorize the proclamation of pardon and amnesty by the President was repealed on the 21st of January, 1867; but this was after the close of the war, when the act had ceased to be important as an expression of the legislative disposition to carry into effect the clemency of the Executive, and after the decision of this court that the President's power of pardon "is not subject to legislation;" that "Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders."[] It is not important, therefore, to refer to this repealing act further than to say that it is impossible to believe, while the repealed provision was in full force, and the faith of the legislature *142 as well as the Executive was engaged to the restoration of the rights of property promised by the latter, that the proceeds of property of persons pardoned, which had been paid into the treasury, were to be withheld from them. The repeal of the section in no respect changes the national obligation, for it does not alter at all the operation of the pardon, or reduce in any degree the obligations of Congress under the Constitution to give full effect to it, if necessary, by legislation.
We conclude, therefore, that the title to the proceeds of the property which came to the possession of the government by capture or abandonment, with the exceptions already noticed, was in no case divested out of the original owner. It was for the government itself to determine whether these proceeds should be restored to the owner or not. The promise of the restoration of all rights of property decides that question affirmatively as to all persons who availed themselves of the proffered pardon. It was competent for the President to annex to his offer of pardon any conditions or qualifications he should see fit; but after those conditions and qualifications had been satisfied, the pardon and its connected promises took full effect. The restoration of the proceeds became the absolute right of the persons pardoned, on application within two years from the close of the war. It was, in fact, promised for an equivalent. "Pardon and restoration of political rights" were "in return" for the oath and its fulfillment. To refuse it would be a breach of faith not less "cruel and astounding" than to abandon the freed people whom the Executive had promised to maintain in their freedom.
What, then, was the effect of the provision of the act of 1870[*] upon the right of the owner of the cotton in this case? He had done certain acts which this court[] has adjudged to be acts in aid of the rebellion; but he abandoned the cotton to the agent of the Treasury Department, by whom it has been sold and the proceeds paid into the Treasury of the *143 United States; and he took, and has not violated, the amnesty oath under the President's proclamation. Upon this case the Court of Claims pronounced him entitled to a judgment for the net proceeds in the treasury. This decree was rendered on the 26th of May, 1869; the appeal to this court made on the 3d of June, and was filed here on the 11th of December, 1869.
The judgment of the court in the case of Padelford, which, in its essential features, was the same with this case, was rendered on the 30th of April, 1870. It affirmed the judgment of the Court of Claims in his favor.
Soon afterwards the provision in question was introduced as a proviso to the clause in the general appropriation bill, appropriating a sum of money for the payment of judgments of the Court of Claims, and became a part of the act, with perhaps little consideration in either House of Congress.
This proviso declares in substance that no pardon, acceptance, oath, or other act performed in pursuance, or as a condition of pardon, shall be admissible in evidence in support of any claim against the United States in the Court of Claims, or to establish the right of any claimant to bring suit in that court; nor, if already put in evidence, shall be used or considered on behalf of the claimant, by said court, or by the appellate court on appeal. Proof of loyalty is required to be made according to the provisions of certain statutes, irrespective of the effect of any executive proclamation, pardon, or amnesty, or act of oblivion; and when judgment has been already rendered on other proof of loyalty, the Supreme Court, on appeal, shall have no further jurisdiction of the cause, and shall dismiss the same for want of jurisdiction. It is further provided that whenever any pardon, granted to any suitor in the Court of Claims, for the proceeds of captured and abandoned property, shall recite in substance that the person pardoned took part in the late rebellion, or was guilty of any act of rebellion or disloyalty, and shall have been accepted in writing without express disclaimer and protestation against the fact so recited, such pardon or acceptance shall be taken as conclusive evidence *144 in the Court of Claims, and on appeal, that the claimant did give aid to the rebellion; and on proof of such pardon, or acceptance, which proof may be made summarily on motion or otherwise, the jurisdiction of the court shall cease, and the suit shall be forthwith dismissed.
The substance of this enactment is that an acceptance of a pardon, without disclaimer, shall be conclusive evidence of the acts pardoned, but shall be null and void as evidence of the rights conferred by it, both in the Court of Claims and in this court on appeal.
It was urged in argument that the right to sue the government in the Court of Claims is a matter of favor; but this seems not entirely accurate. It is as much the duty of the government as of individuals to fulfil its obligations. Before the establishment of the Court of Claims claimants could only be heard by Congress. That court was established in 1855[*] for the triple purpose of relieving Congress, and of protecting the government by regular investigation, and of benefiting the claimants by affording them a certain mode of examining and adjudicating upon their claims. It was required to hear and determine upon claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States.[] Originally it was a court merely in name, for its power extended only to the preparation of bills to be submitted to Congress.
In 1863 the number of judges was increased from three to five, its jurisdiction was enlarged, and, instead of being required to prepare bills for Congress, it was authorized to render final judgment, subject to appeal to this court and to an estimate by the Secretary of the Treasury of the amount required to pay each claimant.[] This court being of opinion[§] that the provision for an estimate was inconsistent with the finality essential to judicial decisions, Congress repealed that provision.[] Since then the Court of Claims has exercised *145 all the functions of a court, and this court has taken full jurisdiction on appeal.[*]
The Court of Claims is thus constituted one of those inferior courts which Congress authorizes, and has jurisdiction of contracts between the government and the citizen, from which appeal regularly lies to this court.
Undoubtedly the legislature has complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decisions. And if this act did nothing more, it would be our duty to give it effect. If it simply denied the right of appeal in a particular class of cases, there could be no doubt that it must be regarded as an exercise of the power of Congress to make "such exceptions from the appellate jurisdiction" as should seem to it expedient.
But the language of the proviso shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. Its great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have. The proviso declares that pardons shall not be considered by this court on appeal. We had already decided that it was our duty to consider them and give them effect, in cases like the present, as equivalent to proof of loyalty. It provides that whenever it shall appear that any judgment of the Court of Claims shall have been founded on such pardons, without other proof of loyalty, the Supreme Court shall have no further jurisdiction of the case and shall dismiss the same for want of jurisdiction. The proviso further declares that every pardon granted to any suitor in the Court of Claims and reciting that the person pardoned has been guilty of any act of rebellion or disloyalty, shall, if accepted in writing without disclaimer of the fact recited, be taken as conclusive evidence in that court and on appeal, of the act recited; and on proof of pardon or acceptance, summarily made on motion *146 or otherwise, the jurisdiction of the court shall cease and the suit shall be forthwith dismissed.
It is evident from this statement that the denial of jurisdiction to this court, as well as to the Court of Claims, is founded solely on the application of a rule of decision, in causes pending, prescribed by Congress. The court has jurisdiction of the cause to a given point; but when it ascertains that a certain state of things exists, its jurisdiction is to cease and it is required to dismiss the cause for want of jurisdiction.
It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power.
The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way? In the case before us, the Court of Claims has rendered judgment for the claimant and an appeal has been taken to this court. We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted to the intestate of the claimants. Can we do so without allowing one party to the controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it?
We think not; and thus thinking, we do not at all question what was decided in the case of Pennsylvania v. Wheeling Bridge Company.[*] In that case, after a decree in this court that the bridge, in the then state of the law, was a nuisance and must be abated as such, Congress passed an act legalizing the structure and making it a post-road; and the court, on a motion for process to enforce the decree, held that the bridge had ceased to be a nuisance by the exercise of the constitutional powers of Congress, and denied the motion. No arbitrary rule of decision was prescribed in that case, *147 but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us no new circumstances have been created by legislation. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary.
We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power.
It is of vital importance that these powers be kept distinct. The Constitution provides that the judicial power of the United States shall be vested in one Supreme Court and such inferior courts as the Congress shall from time to time ordain and establish. The same instrument, in the last clause of the same article, provides that in all cases other than those of original jurisdiction, "the Supreme Court shall have appellate jurisdiction both as to law and fact, with such exceptions and under such regulations as the Congress shall make."
Congress has already provided that the Supreme Court shall have jurisdiction of the judgments of the Court of Claims on appeal. Can it prescribe a rule in conformity with which the court must deny to itself the jurisdiction thus conferred, because and only because its decision, in accordance with settled law, must be adverse to the government and favorable to the suitor? This question seems to us to answer itself.
The rule prescribed is also liable to just exception as impairing the effect of a pardon, and thus infringing the constitutional power of the Executive.
It is the intention of the Constitution that each of the great co-ordinate departments of the government  the Legislative, the Executive, and the Judicial  shall be, in its sphere, independent of the others. To the executive alone is intrusted the power of pardon; and it is granted without limit. Pardon includes amnesty. It blots out the offence pardoned and removes all its penal consequences. It may be granted on conditions. In these particular pardons, *148 that no doubt might exist as to their character, restoration of property was expressly pledged, and the pardon was granted on condition that the person who availed himself of it should take and keep a prescribed oath.
Now it is clear that the legislature cannot change the effect of such a pardon any more than the executive can change a law. Yet this is attempted by the provision under consideration. The court is required to receive special pardons as evidence of guilt and to treat them as null and void. It is required to disregard pardons granted by proclamation on condition, though the condition has been fulfilled, and to deny them their legal effect. This certainly impairs the executive authority and directs the court to be instrumental to that end.
We think it unnecessary to enlarge. The simplest statement is the best.
We repeat that it is impossible to believe that this provision was not inserted in the appropriation bill through inadvertence; and that we shall not best fulfill the deliberate will of the legislature by DENYING the motion to dismiss and AFFIRMING the judgment of the Court of Claims; which is
ACCORDINGLY DONE.
Mr. Justice MILLER (with whom concurred Mr. Justice BRADLEY), dissenting.
I cannot agree to the opinion of the court just delivered in an important matter; and I regret this the more because I do agree to the proposition that the proviso to the act of July 12th, 1870, is unconstitutional, so far as it attempts to prescribe to the judiciary the effect to be given to an act of pardon or amnesty by the President. This power of pardon is confided to the President by the Constitution, and whatever may be its extent or its limits, the legislative branch of the government cannot impair its force or effect in a judicial proceeding in a constitutional court. But I have not been able to bring my mind to concur in the proposition that, under the act concerning captured and abandoned property, there remains in the former owner, who had given aid and *149 comfort to the rebellion, any interest whatever in the property or its proceeds when it had been sold and paid into the treasury or had been converted to the use of the public under that act. I must construe this act, as all others should be construed, by seeking the intention of its framers, and the intention to restore the proceeds of such property to the loyal citizen, and to transfer it absolutely to the government in the case of those who had given active support to the rebellion, is to me too apparent to be disregarded. In the one case the government is converted into a trustee for the former owner; in the other it appropriates it to its own use as the property of a public enemy captured in war. Can it be inferred from anything found in the statute that Congress intended that this property should ever be restored to the disloyal? I am unable to discern any such intent. But if it did, why was not some provision made by which the title of the government could at some time be made perfect, or that of the owner established? Some judicial proceeding for confiscation would seem to be necessary if there remains in the disloyal owner any right or interest whatever. But there is no such provision, and unless the act intended to forfeit absolutely the right of the disloyal owner, the proceeds remain in a condition where the owner cannot maintain a suit for its recovery, and the United States can obtain no perfect title to it.
This statute has recently received the attentive consideration of the court in two reported cases.
In the case of the United States v. Anderson,[*] in reference to the relation of the government to the money paid into the treasury under this act, and the difference between the property of the loyal and disloyal owner, the court uses language hardly consistent with the opinion just read. It says that Congress, in a spirit of liberality, constituted the government a trustee for so much of this property as belonged to the faithful Southern people, and while it directed that all of it should be sold and its proceeds paid into the treasury, gave to this class of persons an opportunity to establish *150 their right to the proceeds. Again, it is said, that "the measure, in itself of great beneficence, was practically important only in its application to the loyal Southern people, and sympathy for their situation doubtless prompted Congress to pass it." These views had the unanimous concurrence of the court. If I understand the present opinion, however, it maintains that the government, in taking possession of this property and selling it, became the trustee of all the former owners, whether loyal or disloyal, and holds it for the latter until pardoned by the President, or until Congress orders it to be restored to him.
The other case which I refer to is that of United States v. Padelford.[*] In that case the opinion makes a labored and successful effort to show that Padelford, the owner of the property, had secured the benefit of the amnesty proclamation before the property was seized under the same statute we are now considering. And it bases the right of Padelford to recover its proceeds in the treasury on the fact that before the capture his status as a loyal citizen had been restored, and with it all his rights of property, although he had previously given aid and comfort to the rebellion. In this view I concurred with all my brethren. And I hold now that as long as the possession or title of property remains in the party, the pardon or the amnesty remits all right in the government to forfeit or confiscate it. But where the property has already been seized and sold, and the proceeds paid into the treasury, and it is clear that the statute contemplates no further proceeding as necessary to divest the right of the former owner, the pardon does not and cannot restore that which has thus completely passed away. And if such was not the view of the court when Padelford's case was under consideration I am at a loss to discover a reason for the extended argument in that case, in the opinion of the court, to show that he had availed himself of the amnesty before the seizure of the property. If the views now advanced are sound, it was wholly immaterial whether Padelford was pardoned before or after the seizure.
NOTES
[*] Halleck's International Law.
[*] 12 Stat. at Large, 820.
[] Ib. 1266.
[] Ib. 590.
[*] 13 Stat. at Large, 737.
[*] 13 Stat. at Large, 741.
[*] 13 Stat. at Large, 758.
[] 15 Id. 699.
[] Ib. 702.
[§] Ib. 711.
[] 14th January, 1867.
[*] 16 Stat. at Large, 235.
[] United States v. Padelford, 9 Wallace, 531.
[*] 10 Stat. at Large, 612.
[] Ib.
[] 12 Ib. 765.
[§] 2 Wallace, 561.
[] 14 Stat. at Large, 9.
[*] 14 Stat. at Large, 44, 391, 444.
[*] 18 Howard, 429.
[*] 9 Wallace, 65.
[*] 9 Wallace, 531.