**In re TAXABLE MUNICIPAL BOND SECURITIES LITIGATION.**

**Civ. A. No. MDL 863.**

United States District Court, E.D. Louisiana.

May 20, 1992.

Jack C. Benjamin, Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, La., Liaison Counsel for plaintiffs.

Gene W. Lafitte, Liskow & Lewis, New Orleans, La., Liaison Counsel for defendants.

## MEMORANDUM AND ORDER

SEAR, Chief Judge.

The taxable municipal bond was created in response to the Tax Reform Act of 1986, which limited the availability of the tax-free status previously afforded municipal bonds. Drexel Burnham Lambert Inc. ("Drexel Burnham") played a significant role in promoting the taxable municipal bond. From July through October 1986, Drexel Burham underwrote seven substantial bond issues offered by six different

municipal authorities.[1] The offering materials stated that the bond proceeds would be used to raise money for salutary public purposes, such as financing the construction or acquisition of low to moderate income housing or multifamily housing or providing funds for agricultural purposes.[2] Instead, the bond trustees used a substantial portion of the proceeds to purchase Guaranteed Investment Contracts ("GICs") issued by Executive Life Insurance Company ("Executive Life"). Executive Life then invested the proceeds from the sale of the GICs in "junk" bonds, an "industry expression for bonds with a credit rating of BB or lower."[3] Junk bonds generally offer high rates of return as compensation for the high risk. The junk bond market collapsed in the early months of 1989. Standard & Poors, Inc. then downgraded Executive Life's rating and the rating of the taxable municipal bond, which caused the value of the municipal bonds to decline.[4]

Numerous purchasers of these bonds, most of whom are individual investors or small community banks,[5] filed lawsuits seeking relief for alleged violations of federal and state law in connection with the issuance of these taxable municipal bonds. Because similar or identical lawsuits were filed in several judicial districts, they have been consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and transferred to the Eastern District of Louisiana. In these consolidated actions, plaintiffs seek relief from the issuers, underwriters, certain brokers, trustees, and law firms involved in the issuance of the bonds.

The seven municipal authorities that offered the eight taxable municipal bond issues were: Louisiana Housing Finance Authority ("LHFA"), Southeast Texas Housing Finance Corp. ("SETHFC"), Louisiana Agricultural Finance Authority ("LAFA"), Memphis Health, Education & Housing Facility Board ("Memphis"), Adams County Ind. Development Authority ("Adams County"), Nebraska Investment Financial Authority ("NIFA"), and El Paso Housing Finance Corp. ("EPHFC").

Drexel Burnham and Howard, Weil, Labouisse & Friedrichs, Inc. ("Howard, Weil") acted as co-lead underwriters for seven of the eight bond offerings. The eighth offering, the Adams County bonds, was underwritten by the First Boston Corporation and Capital Markets Corporation, although plaintiffs allege that the underwriting syndicate for this bond issue included Drexel Burnham as well.[6] Additionally, plaintiffs have sued certain individuals involved in underwriting these bonds: Alan Arnold, former President of Howard Weil; Michael Milken, former heard of Drexel Burnham's

---

**1.** The eighth bond issue challenged in this litigation was not underwritten by Drexel Burnham, see *infra* p. 956, though the bond was structured in the same manner as those underwritten by Drexel Burnham.

**2.** The official statements for the bond issues were filed as an exhibit to the Joint Memorandum of Underwriters, Certain Issuers, and Certain Other Defendants in Support of Motion to Dismiss, Doc. No. 139 (hereinafter "Joint Memo").

**3.** A. Pessin, J. Ross, *Words of Wall Street: 2000 Investment Terms Defined* 117 (1983).

**4.** The complaint states that, as a result of the collapse of the junk bond market and the proliferation of junk bonds in Executive Life's investment portfolio, Standard & Poors downgraded Executive Life's rating. Then Standard & Poors downgraded the taxable municipal bonds backed by Executive Life GICs. As this information became known in the market, the trad-

ing price of the taxable municipal bond declined. Memphis Complaint ¶¶ 116–118. Defendants state that after the collapse of the junk bond market, the bonds continued to meet their interest payment obligations. However, in April 1991, the Commissioner of Insurance of the State of California initiated conservatorship proceedings for Executive Life and obtained a moratorium that precluded further payments on the GICs. As a result, a number of the bonds defaulted. Joint Memo, *supra* note 2, p. 16.

**5.** Plaintiffs' Joint Memorandum in Opposition to Defendants' Motion to Dismiss, Doc. No. 198, p. 10 (hereinafter "Plaintiffs' Opposition").

**6.** Drexel Burnham is not named as a defendant in the amended complaints because, in May 1990, it filed a petition for reorganization pursuant to Chapter 11 of Title 11 of the United States Code, which automatically stayed prosecution against Drexel Burnham, as provided by 11 U.S.C. § 362(a)(3). *In re Drexel Burnham Lambert Group, Inc.*, No. 10421 (Bankr.S.D.N.Y. 1990).

High Yield Convertible Bond Department;[7] and Peter Avalone, former head of Drexel Burnham's Municipal Bond Department. Plaintiffs also seek relief from each member of the underwriting syndicate for his alleged liability directly as a seller of the bonds and vicariously for the conduct of the co-lead underwriters, who the sellers allegedly designated to represent them. Certain plaintiffs also have asserted claims against the brokers who directly sold the bonds to them. Some of these brokers were members of the underwriting syndicates involved in the sale of the bonds; others apparently only sold the bonds in the secondary market.[8]

Additionally, plaintiffs name the trustees for each bond issue as defendants: Commercial National Bank (LHFA bonds); NCNB—Texas (SETHFC bonds); Premiere Bank, successor to Louisiana National Bank, and Sunburst Bank, successor to Capital Bank and Trust, (LAFA bonds); First Tennessee Bank (Memphis bonds); First Interstate Bank of Denver (Adams County bonds); Norwest Bank (NIFA bonds); and Texas Commerce Bank (EPHFC bonds).

Also named as defendants are the law firms of Kutak Rock & Campbell ("Kutak") and Diamond Rash Leslie Smith & Samaniego ("Diamond Rash"). Kutak allegedly served as counsel to the underwriters and participated in structuring the bonds, in obtaining a favorable rating from Standard & Poor's, Inc. and in making disclosures to the investing public. Diamond Rash served as counsel for EPHFC, an issuer.

Finally, plaintiffs name Executive Life Insurance Company, its parent company First Executive Corporation ("First Executive"), Fred Carr, Chairman of the Board and Chief Executive Officer of both First Executive and Executive Life, and Public Financial Management, Inc., a consultant on the Memphis bond issue, as defendants.

The underwriter defendants, certain issuer defendants, and certain other defendants[9] filed a motion to dismiss plaintiffs' federal securities claims alleged under section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"). Defendants contend that plaintiffs filed their claims after the statute of limitations period had expired and therefore must be dismissed.

*Analysis*

■ Neither section 10(b) nor Rule 10b–5 promulgated thereunder contains a statute of limitations period for actions alleging violations of these provisions. Accordingly, federal courts, when considering the timeliness of the commencement of a section 10(b) action, applied borrowed state or federal limitations periods. Those circuits borrowing a state limitations period looked to the law of the state in which the action was commenced, and generally borrowed the limitations period applicable to the state cause of action that substantively most resembled the federal § 10(b) action.[10] Similarly, those circuits applying a borrowed federal limitations period borrowed the limitations period from the federal cause of action most analogous to the § 10(b) action, specifically, the limitations period expressly provided in the Securities Act of 1933[11] and the Securities Exchange Act of 1934[12] for other causes of action

---

7. Claims against Michael Milken have since been transferred for consolidation in *In re Michael Milken*, MDL No. 924.

8. *See* Plaintiffs' Opposition, *supra* note 5, p. 12.

9. The names of these defendants are listed in the Joint Memo, *supra* note 2, p. 1. In light of subsequent congressional developments, the foregoing defendants filed a supplemental memorandum on this issue, Doc. No. 353 (hereinafter "Joint Supplemental Memo"). The following defendants also joined that memorandum: the indenture trustees, Diamond Rash, El Paso Housing Finance Corp., and those defendants listed on p. 1, n. 1 of the Joint Supplemental Memo.

10. *See, e.g., Jensen v. Snellings,* 841 F.2d 600 (5th Cir.1988) (borrowing the limitations period applicable to violations of state securities law).

11. Section 11 of the Securities Act of 1933 provides a private right of action for misrepresentations and material omissions in the initial offering of a security. 15 U.S.C. § 77k.

12. Section 9(e) of the Securities Exchange Act of 1934 provides a private right of action for manipulation of the price of a security in the secondary market. 15 U.S.C. § 78i(e).

created by those acts.[13] The adoption of state limitations periods by some circuits and the adoption of the federal limitations period by others resulted in the application of inconsistent limitations periods among the circuits.

On June 20, 1991, the Supreme Court resolved the conflict among the circuits by adopting a uniform federal statute of limitations period for § 10(b) and Rule 10b–5 actions. The Court applied the same limitation period for violation of section 10(b) and Rule 10b–5 as prescribed for other causes of action under the 1933 and 1934 Securities Acts and held that an action "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). On the same day that *Lampf* was decided, the Court also decided *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991), and held that, when a court in a civil case applies a new rule of law to the parties before it, that rule of law must be applied retroactively in all other cases.

Because these actions were filed before the *Lampf* decision and because the *Lampf* Court applied the new statute of limitations period to the parties before it, defendants argued that *Beam* dictated that the limitations period adopted in *Lampf* applied retroactively to this action.[14] Defendants contended that the application of this limitations period to plaintiffs' § 10(b) claims would bar them.

Before defendants' contention was resolved, Congress enacted legislation that precluded retroactive application of the *Lampf* statute of limitation. Section 476 of the Federal Deposit Insurance Corpora-

tion Improvement Act of 1991, was added as a new section to the Securities and Exchange Act of 1934, and provides:

(a) EFFECT ON PENDING CAUSES OF ACTION—The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

(b) EFFECT ON DISMISSED CAUSES OF ACTION—Any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991—

(1) which was dismissed as time barred subsequent to June 19, 1991, and

(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

shall be reinstated on motion by the plaintiff not later than 60 days after the date of enactment of this section.

In enacting this provision, Congress accomplished two things. First, it declared that the limitations period for pending § 10(b) actions that were commenced on or before June 19, 1991, the day before the Supreme Court issued its opinions in *Lampf* and *Beam*, would be that limitations period applicable in the relevant jurisdiction as of June 19, 1991. Second, it declared that the law of retroactivity in force in a given jurisdiction on June 19, 1991 likewise would govern all § 10(b) claims pending on June 19, 1991. The cumulative effect of these declarations is: that jurisdictions that had borrowed state limitations periods before *Lampf* must continue to apply the borrowed state limita-

---

**13.** Both acts provide that these causes of action must commence within one year from date of discovery of the violation and within three years after such violation. 15 U.S.C. §§ 77m, 78i(e). *See Ceres Partners v. GEL Assocs.,* 918 F.2d 349 (2d Cir.1990); *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); *In re Data Access Sys. Secs. Litig.,* 843 F.2d 1537 (3d Cir.), *cert. denied sub nom. Vitiel-*

*lo v. Kahlowsky & Co.,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988) (all adopting the one-year/three-year period).

**14.** Indeed, other courts have interpreted *Beam* to require that the *Lampf* rule be applied retroactively. *See, e.g., Welch v. Cadre Capital,* 946 F.2d 185, 188 (2d Cir.1991).

tions period to § 10(b) actions pending on June 19, 1991, and that jurisdictions that already had adopted the uniform federal limitations period before *Lampf*, but had declined to apply that period retroactively, must continue to not apply the limitations period retroactively.

Because this action was filed prior to June 19, 1991, section 476 requires the application of the limitations period in effect in this jurisdiction on June 19, 1991. As of that date, the Fifth Circuit applied a borrowed state limitations period[15] of two years.[16] Recognizing that section 476 impacted this motion to dismiss, defendants filed a supplemental memorandum in which they argue that section 476 unconstitutionally violates the separation of the powers of the judiciary from those of the legislature. Defendants alternatively argue that section 476 is unconstitutional because it contradicts the Supreme Court's decision in *James B. Beam.*

In accordance with 28 U.S.C. § 2403, Attorney General was advised that the constitutionality of an Act of Congress had been questioned. In response, the Attorney General filed an *amicus curiae* brief in support of the constitutionality of section 476.

The separation of powers doctrine was first set forth in the Supreme Court's decision in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). The controversy in *Klein* arose during the aftermath of the Civil War. Klein sued under a law that permitted recovery of land captured or abandoned during the War if the claimant could prove that he had not aided the rebellion. In an earlier case, the Supreme Court had held that the receipt of a presidential pardon conclusively proved the property owner's loyalty under this law and, thus, absolved him of any participation in the rebellion. However, Congress subsequently enacted legislation that prohibited courts from considering pardons as proof of loyalty; instead, the court was required to consider the acceptance of a pardon without disclaimer conclusive evidence of prior disloyalty.[17]

The Supreme Court found that, in enacting the legislation, Congress had "passed the limit which separates the legislative from the judicial power,"[18] because Congress had "prescribe[d] a rule for the decision of a cause in a particular way."[19] The Court invalidated the legislation as violative of the separation of powers doctrine because it prohibited the Court from according pardons "the effect th[e] [C]ourt previously had adjudged them to have."[20]

The *Klein* Court stated that Congress exceeds its power when it prescribes a rule for decision of a cause in a particular way. But, the court's holding is more narrow than this language suggests. The Court held that Congress cannot interfere with the court's inherent power to decide facts by arbitrarily directing the court, in a particular case, to give significance to, or ignore evidence in a manner contrary to the court's previous treatment of that evidence. Twice the Court makes it clear that its holding is this narrow: "[T]he language of the proviso shows plainly that ... [i]ts great and controlling purpose is to deny to pardons ... the effect which this court had adjudged them to have."[21] "[T]he court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary."[22]

Because *Klein*'s holding appeared to conflict with a previous decision of the Court, the Court distinguished that case. In the prior case, *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), the Court had held that any bridge across the Ohio river was an obstruction to navigation.

---

**15.** *See, e.g., Jensen v. Snellings,* 841 F.2d 600 (5th Cir.1988).

**16.** *See infra* p. 963–65.

**17.** 80 U.S. at 144–45.

**18.** *Id.* at 147.

**19.** *Id.* at 146.

**20.** *Id.* at 145.

**21.** *Id.* at 145.

**22.** *Id.* at 147.

Thereafter, Congress passed a statute declaring that bridges across the Ohio river are lawful structures and that navigation of the river must not interfere with a bridge.[23] As in *Klein*, the statute dictated a conclusion that was contrary to the Court's previous decision, yet, the *Wheeling Bridge* Court upheld the constitutionality of the legislation. In distinguishing *Wheeling Bridge*, the *Klein* Court reasoned,

> No arbitrary rule of decision was prescribed in [the *Wheeling Bridge*] case, but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us no new circumstances have been created by the legislation. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary.[24]

The Court upheld the legislation in *Wheeling Bridge* because the legislation created new circumstances. In *Wheeling Bridge*, the Court had found that, at the time of its decision that the bridge obstructed navigation, Congress had secured to the public the free and unobstructed use of the river and the bridge impermissibly interfered with the public's right.[25] In enacting the subsequent legislation, Congress then modified the public's right to use the river by making the bridge a lawful structure.[26] Thus, the legislation changed the rights of the public. Unlike the legislation in *Wheeling Bridge*, the legislation in *Klein* dictated how the Court must find the facts without changing the legal rules that prescribe the rights and conduct of the parties.

■ The distinction between the Court's decisions in *Klein* and *Wheeling Bridge* can be difficult to discern and apply in new

situations. But, Congress unquestionably possesses the power to change or make law. What Congress cannot do is instruct the court on how to decide the merits of a particular controversy without changing the legal rules that prescribe the rights of the parties. Moreover, what these principles imply is that, before a separation of powers problem can even arise, the legislation, at a minimum, must affect the court's decision on the merits.

A later Court explicitly makes this point. In *United States v. Sioux Nation of Indians*,[27] the Sioux Indians brought a land claim against the Government, which was denied on grounds that the court lacked the authority to render the award. The Indians later reurged their claim when Congress created a special tribunal for resolving tribal grievances. That claim was dismissed on res judicata grounds. Congress then legislatively abrogated the Government's res judicata defense. The Supreme Court considered whether, in enacting this legislation, Congress violated the separation of powers doctrine. The Court upheld the legislation by distinguishing the *Klein* decision. The Court stated,

> [A]nd even more important, the proviso at issue in *Klein* had attempted "to prescribe a rule for the decision of a cause in a particular way." The amendment at issue [here], however, . . . waived the defense of res judicata so that a legal claim could be resolved on the merits. Congress made no effort . . . to control the [court's] ultimate decision of that claim.[28]

The Court emphasized that the legislation did not affect the merits of the pending claim. For that reason, the Court found that the separation of powers was not implicated. More importantly, the Court did not find it necessary to analyze whether

---

23. 59 U.S. at 429.

24. *Klein*, 80 U.S. at 146–47.

25. *Wheeling Bridge*, 59 U.S. at 430.

26. *Id.* at 430–32. *See also Robertson v. Seattle Audubon Soc'y*, —— U.S. ——, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) (In addressing a separation of powers challenge, the Court upheld the legisla-

tion because the it modified the law by replacing the legal standards against which the challenged conduct would be judged.)

27. 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

28. *Id.* at 2735–36 (quoting *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146, 20 L.Ed. 519 (1871)).

the legislation changed the legal rights and conduct of the parties.

■ What this indicates is that, at a minimum, the challenged legislation must affect the decision on the merits. When it does, then the court must decide whether the legislation changes the rights or conduct of the parties. But when the legislation does not affect the merits, there is no way the legislation violates the separation of powers doctrine.

Section 476 does not dictate the decision of this action on the merits. As was the case in *Sioux Nation,* in enacting section 476, Congress simply modified a defense that is involved in this controversy but that defense does not affect the merits of the claim. Accordingly, Congress has not violated the separation of powers doctrine and section 476 is therefore not unconstitutional.

Several other district courts have addressed the issue of whether Congress violated the separation of powers doctrine in enacting section 476. The majority of these courts also uphold the constitutionality of the legislation.[29]

■ Defendants alternatively adopt the reasoning advanced in *TGX Corp. v. Gaylon Simmons,*[30] wherein the court found section 476 unconstitutional because it contradicts the Court's decision in *James B. Beam Distilling Co. v. Georgia.*[31] *James B. Beam* held that courts must apply retroactively rules of law created by the judiciary. Because the *Lampf* Court created a new rule of law by establishing a uniform limitations period for section 10(b) actions, *Beam* dictates that this period be applied retroactively. Yet, section 476 overrules this result by precluding the retroactive application of the new limitations period.

Under the system of checks and balances created by the Constitution, Congress has the power to overrule decisions of the Supreme Court. However, Congress cannot enact legislation that violates the Constitution. The latter principle restricts Congress' power to overrule certain Court decisions: Congress cannot overrule Court decisions that are dictated by the Constitution. In effect, if legislation overrules a constitutional decision, the legislation itself violates the Constitution.

The court in *TGX Corp. v. Gaylon Simmons*[32] found section 476 unconstitutional because it found that the Constitution requires the retroactive application of judicial rules of law. In reaching this conclusion, the court relied on the reasoning employed by the *Beam* Court:

> [S]elective prospectivity ... breaches the principle that litigants in similar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally. "We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a 'new' rule of *constitutional* law." *Desist v. United States,* 394 U.S. 244, 258–59, 89 S.Ct. 1030, 1039 [22 L.Ed.2d 248] (1969) (Harlan, J., dissenting). For this reason, we abandoned the possibility of selective prospectivity in the criminal context in *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987)....[33]

But, this reasoning indicates that the Constitution requires that judicial rules of law *founded in the Constitution* must be retroactive, not that all judicially created rules of law must be retroactive. The *Beam* Court's reliance on *Griffith* supports this conclusion. The *Griffith* Court held

**29.** *See, e.g., TBG, Inc. v. Richard A. Bendis,* No. 89–2423, 1991 WL 47402 (Kan. Mar. 5, 1992); *Venturtech II v. Deloitte Haskins & Sells,* 790 F.Supp. 574 (E.D.N.C.1992); *James Bankard v. First Carolina Communications, Inc.,* No. 89–8571, 1992 WL 3694 (N.D.Ill. Jan. 3, 1992).

**30.** 786 F.Supp. 587 (E.D.La.1992).

**31.** —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991).

**32.** 786 F.Supp. 587 (E.D.La.1992).

**33.** *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 2444–45, 115 L.Ed.2d 481 (1991) (emphasis added) (other citations omitted).

that "a new rule for the conduct of criminal prosecutions is to be applied retroactively." [34] Rules for the conduct of criminal prosecutions by their very nature are constitutional rules of law because, in every criminal prosecution, the basic constitutional rights of life and liberty are at stake. This conclusion is buttressed by the Court's own statement that "failure to apply a newly declared *constitutional* rule to criminal cases pending on direct review violates basic norms of constitutional adjudications." [35]

Thus, the decision in *Beam* is dictated by the Constitution only to the extent that constitutional rules of law must be applied retroactively. *Beam's* holding that new rules of law not founded on constitutional principles likewise must be applied retroactively is not demanded by the Constitution.

Section 476 precludes the retroactive application of the rule of law created by the Supreme Court in *Lampf.* That rule of law simply establishes a limitations period for section 10(b) actions. It is not a rule of law dictated by the Constitution. Thus, the Constitution does not demand that this rule be applied retroactively. Accordingly, section 476 does not violate the Constitution and is not unconstitutional.

■ Having found the statute constitutional, the statute dictates that the limitations period governing this action is "the limitation period provided by the laws applicable in the jurisdiction ... as such laws existed on June 19, 1991." In this multidistrict litigation, the claims were filed in various jurisdictions and transferred to this district for consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407. That the statute demands the application of the law applicable in the jurisdiction, raises

that question of which jurisdiction—that of the transferor court or that of the transferee court.

Prior to 1987, in cases consolidated for pretrial proceedings pursuant to § 1407, a transferee court applied the law of the transferor forum. [36] This rule was extrapolated by analogy from *Van Dusen v. Barrack,*[37] wherein the Supreme Court held that, in cases transferred for change of venue pursuant to 28 U.S.C. § 1404, the law of the transferor forum applies. [38] In the change of venue context, the reason for applying the law of the transferor forum is:

> First, § 1404(a) should not deprive parties of state law advantages that exist absent diversity jurisdiction. Second, § 1404(a) should not create or multiply opportunities for forum shopping. Third, the decision to transfer venue under § 1404(a) should turn on considerations of convenience and the interest of justice rather than on the possible prejudice resulting from a change of law. [39]

In 1987, the District of Columbia Circuit Court of Appeals addressed "whether the *Van Dusen* rule—that the law applicable in the transferor forum attends the transfer—should apply to transferred federal claims." [40] In that multidistrict litigation, claims filed in various circuits were transferred pursuant to § 1407 consolidated pretrial proceedings. The court held that the law of the transferee forum should apply but that law of the transferor forum merits close consideration. The court reasoned:

> The point has been cogently made that venue provisions are designed with geographical convenience in mind, and not to 'guarantee that the plaintiff will be able

---

**34.** *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

**35.** *Id.* at 322, 107 S.Ct. at 713.

**36.** *In re Plumbing Fixtures Litig.,* 342 F.Supp. 756 (J.P.M.D.L.1972), *see Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 408 n. 7 (2nd Cir.1975).

**37.** 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

**38.** *See Ferens v. John Deere & Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (interpreting *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

**39.** *Id.* at 1280.

**40.** *In re Korean Air Lines Disaster,* 829 F.2d 1171, 1174 (D.C.Cir.1987), *aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

to select the law that will govern the case.'

．　　．　　．　　．　　．

Application of *Van Dusen* in this matter before us, we emphasize, would not produce uniformity. There would be one interpretation of federal law for cases initially filed in districts within the [transferor forum], and opposing interpretations for cases filed elsewhere. Applying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially file suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings. Indeed, because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory. Our system contemplates differences between different states' laws; thus a multidistrict judge asked to apply divergent state positions on a point of law would face a coherent, if sometimes difficult, task. But it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law.

．　　．　　．　　．　　．

... The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.[41]

I agree with this reasoning.[42] Accordingly, the law of the transferee forum, here the Fifth Circuit, governs plaintiffs' federal claims.

Because federal law had not established a uniform limitations period within which a private litigant must bring his action for securities violations as of June 19, 1991, the Fifth Circuit repeatedly applied "the period which the forum state applies to the state cause of action bearing the closest substantive resemblance to the implied cause of action arising under the federal securities law."[43]

In adopting the rule of applying the "closest" state law limitations period for section 10(b) actions, the Fifth Circuit felt compelled by the Supreme Court's evident approval of this rule and prior case law. The court however expressed its dissatisfaction. The court would have preferred to apply the period of limitations applicable to a similar cause of action expressly provided in the federal securities law because such an approach "would lead to desirable uniformity in securities litigation from state to state and would eliminate the need to engage in difficult and essentially esoteric comparisons of state and federal remedies."[44]

Since this Fifth Circuit decision in 1978, the Supreme Court has rejected the rigid rule that state limitations periods necessarily govern federal claims when no federal limitations period is expressly provided.[45] The Court has stated,

[W]hen a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the prac-

**41.** *Id.* at 1175–76 (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257 n. 24, 102 S.Ct. 252, 266 n. 24, 70 L.Ed.2d 419 (1981)) (footnotes omitted).

**42.** *See Eckstein v. Balcor Film Investors,* 740 F.Supp. 572 (E.D.Wis.1990); *In re Air Crash Disaster at Stapleton Int'l Airport,* 720 F.Supp. 1493 (D.Colo.1989) (adopting this reasoning).

**43.** *McNeal v. Paine, Webber, Jackson & Curtis, Inc.,* 598 F.2d 888, 891 (5th Cir.1979). *See also Sioux Ltd., Secs. Litig. v. Coopers & Lybrand,* 914 F.2d 61 (5th Cir.1990); *Jensen v. Snellings,* 841

F.2d 600 (5th Cir.1988); *Corwin v. Marney, Orton Invs.,* 843 F.2d 194 (5th Cir.), *cert. denied sub nom. VanCaspel v. Corwin,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988); *Wood v. Combustion Eng., Inc.,* 643 F.2d 339 (5th Cir. 1981).

**44.** *McNeal,* 598 F.2d at 892.

**45.** *Agency Holding Corp. v. Malley–Duff & Assocs.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

ticalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law.[46] Defendants argue that, in light of the Fifth Circuit's dissatisfaction with borrowing from state law and these intervening decisions, the Fifth Circuit would have declined to borrow a limitations period from state law in favor of a more analogous federal law. This contention fails for two reasons.

First, what the defendants suggest I do today is indeed what the Supreme Court did in *Lampf*, and Congress has mandated that the *Lampf* decision cannot be applied to actions pending on June 19, 1991. Second, since the intervening decisions from the Supreme Court, the Fifth Circuit has had the opportunity to borrow a limitations period from federal law, rather than state law.[47] Because the court had not done so as of June 19, 1991, I am bound to apply the law of the Fifth Circuit extant on that date.

■ That the Fifth Circuit adopts the "closest" state law limitations period raises the issue of which state's law to apply.[48] Ordinarily, a federal district court applies the law of the state in which it sits, which most often is the state in which the plaintiff resides and in which he filed his action, whereas, in this action, the plaintiffs reside in, and filed their claims, in various states.[49]

To apply to law of the state in which each action was filed, would result in applying dozens of different statutes of limitations and could mean that, even though the plaintiffs assert essentially the same claims against a common group of defendants, some plaintiffs' claims are time barred and others are not, based solely on the fortuity of where plaintiffs elected to file. Thus, the use of multiple state limitations periods would frustrate the goals of multidistrict treatment, eliminating the possibility of conflicting pretrial rulings[50] and achieving the efficient resolution of complex litigation.[51] Accordingly, to foster uniformity and efficiency, I elect to apply the statute of limitations law of the forum state, Louisiana, to all plaintiffs' § 10(b) claims.[52]

■ Louisiana's two-year Blue Sky prescriptive period[53] governs actions brought pursuant to section 10(b) and Rule 10b–5.[54] Although the state law limitations period applies to the federal securities claim, federal law governs when that limitations period begins to run.[55] "Under federal law, the limitations period commences when 'the aggrieved party has either knowledge of

**46.** *DelCostello*, 462 U.S. at 172, 103 S.Ct. at 2294.

**47.** *See Sioux Ltd., Secs. Litig. v. Coopers & Lybrand*, 914 F.2d 61 (5th Cir.1990); *Jensen v. Snellings*, 841 F.2d 600 (5th Cir.1988); *Corwin v. Marney, Orton Invs.*, 843 F.2d 194 (5th Cir.), *cert. denied sub nom. VanCaspel v. Corwin*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).

**48.** Plaintiffs contend that, under the law of any state, they filed their claims timely. Plaintiffs' Joint Supplemental Opposition to Certain Defendants' Supplemental Memorandum in Support of Motions to Dismiss the Eight Amended Complaints, Doc. No. 384, p. 27.

**49.** The Fifth Circuit has held that the "forum state's statute of limitations applies without regard to the residency of the parties." *Nortek, Inc. v. Alexander Grant & Co.*, 532 F.2d 1013, 1015 (5th Cir.1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 742, 50 L.Ed.2d 754 (1977). Similarly, the forums state's statute of limitations may apply without regard to the place of filing.

**50.** *See In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F.Supp. 504, 506 (J.P.M.L.

1976); *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 490 (J.P.M.L.1968) (to the effect that the purpose of multidistrict treatment is to eliminate conflicting pretrial rulings).

**51.** *See* 28 U.S.C. § 1407(a); *also State Teachers Retirement Bd. v. Fluor Corp.*, 80 F.R.D. 142, 145 (S.D.N.Y.1978) (applying the "limitations period of the state of each potential class member would make this suit, as well as almost all 10b–5 class actions, unmaintainable").

**52.** *Accord Pinney v. Edward D. Jones & Co.*, 735 F.Supp. 915, 921–22 (W.D.Ark.1990) (In securities fraud class action with class members from 30 states, the court applied the statute of limitations provided by the forum state instead of each members' state of residence).

**53.** La.Rev.Stat.Ann. 51:714(C).

**54.** *See, e.g., Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988).

**55.** *Id.*

the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge' of the violation." [56] Thus, the two year limitations period for plaintiffs' section 10(b) action did not begin to run until plaintiffs discovered or should have discovered, in the exercise of reasonable diligence, the alleged fraudulent conduct.

Defendants suggest that, because plaintiffs filed the complaint more than two years after the alleged fraudulent acts occurred, such that it appears the limitations period had expired, plaintiffs must plead with particularity either their due diligence efforts to discover the fraud or the affirmative acts of the defendants to conceal the fraud. Neither contention is accurate.

First, plaintiffs need only allege that they exercised reasonable diligence and, in so doing, discovered the facts giving rise to their § 10(b) claim within the limitations period. Plaintiffs need not allege specific acts of due diligence. For instance, the Fifth Circuit reversed the district court's dismissal pursuant to Rule 12 because the plaintiff had alleged that his complaint "was filed within two years of the time the fraudulent scheme was discoverable by the use of reasonable diligence." [57] The court found this allegation sufficient to withstand dismissal pursuant to Rule 12. Similarly, the plaintiffs in this action have satisfied this pleading requirement. Plaintiffs allege that they "could not have discovered in the exercise of due diligence until the completion of the investigation by their attorneys which ultimately led to the filing of this Complaint" [58] the facts supporting their section 10(b) claims.

Second, even though plaintiffs filed their claims more than two years after the alleged fraudulent conduct, plaintiffs need not specifically plead that the defendants fraudulently concealed the fraud for their claim to be timely. The Fifth Circuit considers concealment of the fraud by the defendants as "only a factor to be considered in determining when the plaintiff should have discovered the fraud." [59] Thus, plaintiffs need only plead that they exercised reasonable diligence; any allegation that the defendants concealed the fraud simply serves as a reason why, in exercising reasonable diligence, plaintiffs could not discover the fraud. For instance, in *Summer v. Land & Leisure, Inc.*,[60] the district court had dismissed plaintiff's securities claim, pursuant to Rule 12, because plaintiff filed the complaint after the limitations period had expired. The Fifth Circuit reversed, finding plaintiff's allegations sufficient to withstand dismissal pursuant to Rule 12. "[Plaintiff] has made significant allegations tending to explain his lack of suspicion and tending to support his allegations of due diligence. As against all defendants, [plaintiff] has alleged *generally* a conspiracy to fraudulently conceal from plaintiff the material facts." [61] Similarly, although not necessary, plaintiffs allege that defendants actively concealed the fraud, which simply offers an explanation as to why plaintiffs did not discover the fraud sooner. Plaintiffs' allegations therefore are sufficient to withstand dismissal pursuant to Rule 12.

Accordingly, defendants' motion to dismiss plaintiffs' section 10(b) and Rule 10b–5 claims as time barred is DENIED.

---

**56.** *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 107 (5th Cir.1987) (quoting *Vigman v. Community National Bank & Trust Co.,* 635 F.2d 455, 459 (5th Cir.1981)).

**57.** *Hooper v. Moutain States Sec. Corp.,* 282 F.2d 195, 206 (5th Cir.1960), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); *accord Corwin v. Marney, Orton Invs.,* 788 F.2d 1063, 1069 (5th Cir.), *cert. denied sub nom. VanCaspel v. Corwin,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).

**58.** Memphis Complaint ¶ 119, Doc. No. 62.

**59.** *Jensen,* 841 F.2d at 607; *see also Landry v. Air Line Pilots Ass'n,* 901 F.2d 404, 412–13 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d (1990).

**60.** 664 F.2d 965 (5th Cir.1981), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3485, 73 L.Ed.2d 1367 (1982).

**61.** *Id.* at 970 (emphasis added).